## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| (1) KENNETH TUROCZI and | ) | |
| (2) TYRENE TUROCZI, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| | ) | |
| vs. | ) | Case No.  5:23-CV-00085-SLP |
| | ) | |
| | ) | |
| (1) THE TRAVELERS COMPANIES | ) | |
| INC., a/k/a/ TRAVELERS | ) | |
| | ) | |
| Defendant. | ) | |

## PLAINTIFFS RESPONSE TO DEFENDANT'S MOTION TO DISMISS AND OBJECTION TO REMOVAL UNDER THE LAW OF DIVERSITY OF CITIZENSHIP

This joint response and objection is filed in response to that motion to dismiss made herein by the Defendant on February 6, 2023 (hereinafter "the motion" or "defendant's motion") and to its' removal from the District Court of Oklahoma County State of Oklahoma done on January 31, 2023 from that court's case numbered CJ-2022-6227 (hereinafter "the removal" or "defendant's removal").  Initially, Defendant's motion advised the court that plaintiffs had no knowledge of the company's "real name" but only named the insurance as "The Traveler's Companies, Inc." because they believed that the entity was a subsidiary or otherwise affiliated with that named parent company. Accordingly, plaintiffs have no objection to and do move this court to recast the matter showing the proper corporate name as is advised by the defendant.  Plaintiffs will, also,

refer to this correct named entity hereinafter as it did in their petition as "Travelers".

This joint response to the motion and objection to the removal is made for the reason that the facts and law relevant to both are for the most part common to the respective issues of removal and failure to state an actionable legal issue and are, therefore, submitted jointly to preserve judicial assets.

## I.   Reply to Motion's Introduction  Statement; Plaintiff's Introductory Fact Statement..

Defendant's reference to time limitation is both incorrect and incomplete. Defendant states that the "plaintiffs' sole cause of action alleges breaches of good faith and fair dealing against Travelers, but notably *does not accuse Travelers of failing to make paymen*t." (Emphasis added.) See, motion pages 2-3.  That is correct  but only to a to a certain extent..  That portion of the petition's fact statement was made to state the accurate fact in this claim by affirming defendant did not wrongfully or totally deny *any* coverage with respect to certain losses suffered by plaintiffs,  but it did use its position as the arbiter of payment in an attempt to deny the amount of its' payment obligations e.g, depreciating the value of destroyed property given wrongful use of depreciation's to lower its value when plaintiffs *had* purchased additional replacement cost protection (relevant to dwellings) and personal property replacement costs (HD-290) that actually existed in the policy's language, but was not applied/administered by its adjusters; also, by establishing policy coverage limits on the basis of a "demolition" rather than a "total reconstruction" analysis to determine various policy limits.  Further,  plaintiffs did and do

deny certain portions of the defendant's allegations in its page 3 that the claim was paid (and finally settled) in early 2019.  That is incorrect; yet this inaccuracy is the basis by which defendant invokes the argument that both contract and tort liability were filed beyond the applicable limitation period established both by Travelers' insurance contract and Oklahoma state statute(s). The detail of this is more fully addressed in response to defendant's Brief Proposition I.    A very important reading of defendant's motion statement which followed the above true statement noted by was:   "Indeed, Plaintiffs acknowledge that *all* claim payments were *timely made* during this time period during the claims process, which was settled by early 2019", citing the Petition's ¶¶ 4-6. (Emphasis added).  Plaintiff did not in any way acknowledge that "all" claims were timely made during the period.  Rather, the facts are that numerous aspects of their loss:  toxic mold coverage caused by the fire (denied), using depreciation to lessen the "base limit" for coverages based upon a depreciation estimate

a.   **Relevant facts that relate to defendant's actual conduct in this claim settlement.**

Petition's referenced paragraph (4) shows that many of the losses in fact occurred and continued after the fire was quelled on account of the enormous ash debris caused by the "Five Alarm" fire coupled with the enormous amount of water (from five fire trucks that responded) that created a mold condition throughout the structure that was continuing to grow worse.  Plaintiffs were forced to remove this enormous amount of mold under the insurer's policy provisions that required a claimant to "preserve the property from further

deterioration and loss" and to also both pay the costs of such preservation incurred by the debris removal and submit such proof before the insurer paid for any of these costs. These costs began as pleaded in March, 2019, but significantly continued long after defendant's alleged settlement of "all claims" made in this loss.  It was in the context of this mold remediation and subsequent  repair/reconstruction costs of the domicile *after* the mold's remediation was completed  that defendant's methods calculated to chiefly lessen payments and thereby deprive plaintiffs of their purchased insurance coverage (including so-called additional coverage or endorsements) also began. Plaintiffs reference that conduct beginning in March, 2019 when insurer with respect to a particular loss would delay payment and/or pay only a partial cost of the loss based upon a wrongful determination of policy limit and thereby wrongful determination of limits upon additional coverage.  The actual dates of defendant's required proof of loss claims, e.g., debris removal and material and labor costs relevant to residence repair, were set forth in plaintiff's counsel's letter of March 16, 2022 to the company's counsel discussing these and other claims, which show those continued losses and payment amount if any that was paid for these losses.  See, plaintiffs' Exhibit 2, attached hereto, which shows the 2022 letter and plaintiff Kenneth Turoczi's sworn affidavit attached to that letter as it's Exhibit one.  This is only a partial and specific description of the facts plaintiff Turoczi has stated under oath occurred during the actual total "settlement process" wherein most unfair treatment, rather than in that described by the defendant as the "2019 claims process"

which was "resolved by early 2019" occurred. (Emphasis added.) At page seven of their brief defendant states that the plaintiff's own accounting of the relevant timely demonstrates that they were "aware" of the facts on which their claims began as early as December 24, 2018. Rather, until Ms. Potts letter of May 11, 2023 shows, plaintiffs were not aware of a denial (in their belief an unexplained delay or failure to pay; which belief was continued by the adjusters recurring acts to not explain the delay nor really advise them of the reason for it). Such"partial denials" were of not only their construction costs, but of other "sub parts" of their claims, such as mold remediation, ordnance and law/ or wrongful use of depreciation to lower the base limit of the claim, etc. Because plaintiffs were led to believe that the settlement process was continuing, because that when they did not get the payments when they expected them, they were *not* advised the payments had been absolutely denied, because of an alleged failure that they had not given timely notice of their election to not demolish and rebuild the structure, but to reconstruct it, this entire process was maintained in something of a 21st Century Limbo. Plaintiffs maintain this "process" was designed not to offer the ordinary citizen a fair and timely of an insurance claim (particularly one that had evolved into an insurance coverage "dispute") Therefore, it was defendant's failure to disclose it's allegation that plaintiffs' alleged *failure to inform* it ("give notice of") of their adoption of a reconstruction of the property, rather than its' demolition and rebuild "plan", materially prejudiced the insurer because it had been "deceived" into "purchasing defendant by virtue of which plaintiffs are now alleging for defense is all barred by both time limits and/or the proper application of how Yet the

delay in advising themshould estop it from claiming that the limitation period began before while insurer was maintaining that *sub silentio* defenset of it's real basis for denial. Such non-disclosure and wrongful employment of litigation periods directly violation 36 O.S. §1250.5 ¶¶ 1, 2 and 4, and the rightful application of legislative intent and public policy.

Not only were certain losses (i.e., spreading mold fungi) occurring *after* the alleged final settlement not paid as mandated by the clear language of the insurer's policy and particularly through denial of the that loss *in toto* because of the lack of notification to insurer, not correctly applied, which additional coverages would actually increase the amounts due them, some insured payment obligations were simply ignored by defendant, normally based upon the "early 2019" payments settlement process the defendant now claims was a final settlement of all plaintiffs' claims. That claim is belied by the numerous "settlement" conduct practices of defendant's appointed claims adjusters and legal counsel, which include the following facts to further explain plaintiffs' claim(s) -- what the defendant states is a claim of "amorphous" nature. Some of these more relevant and important facts will be outlined in order of date of occurrence and their relevance in that they show a violation of very specific Oklahoma law with respect to *unacceptabl*e conduct in the fair and *prompt* settlement of an insurance claim. See, Exhibit 1, attached here to and other statement of fact made in the body of argument. These acts include violation of the provisions of the Oklahoma Unfair Claims Settlement Practices Act: 36 O.S. §§ 1250.1 thru 1250.16 (hereafter the "Unfair Claims Settlement Practices Act" or

"UCSPA" or "the Act"), Title 15 O.S. , § 211, and any other statutory provision or judicial precedent that governs the conduct of insurers or employees of insurers in their settlement practices of claims made by their insured to be fair and equitable in nature.

As the Petition states, the multiple settlement acts of defendant through these employees' acts or omissions were unfair and neither equitable or prompt. They first began to occur for example when plaintiffs received bills for debris removal which their retained expert engineer had advised needed to be totally completed before the property structure began to be repaired. These billing invoices were received by plaintiff Tyrene Turoczi  (hereafter also as "plaintiff Tyrene") for contract debris removal work that  had begun in March, 2019.  These bills were each for several instances of debris removal (sometimes for periods of several weeks).  When they were received plaintiff Tyrene would immediately contact adjuster Watts, who would in turn would forward them to appropriate offices within the insurance company.  A text message from adjuster Watts to her dated March 28, 2019, which was responding to an earlier  text  from her asking for the return of  debris removal receipts  of payments she had earlier made of invoices  owed for debris removal. Watts, who  had stated that he would use his computer  to scan them and furnish them to counselor Timberlake.  Plaintiff Tyrene's initial text had also asked the status of of these receipts.   Watts stated in reply he could just  scan them and return the originals to her.

> "Sarah's (Timberlake) office ***does have*** those (debris removal receipt) folders .   .   . that I picked up when we met at the trailer ( where plaintiffs were living). She (Timberlake) would like to deliver those back to you." (Emphasis added).

An earlier occurrence where defendant had been advised that the plaintiffs' intent was

to rebuild, if possible, was on on January 16, 2019, when they met with Watts at his first time to see the ruined structure. Watts at that early date was advocating the demolition method and asked plaintiffs why? Plaintiff Tyrene told Watts that the reason(s) plaintiffs both wanted to rebuild the residence were several: (1) it was sentimental in that they had lived there for over twenty years and their three sons had all been raised there; (2) the neighborhood had many residents with whom they had become friends, some very close friends, and children who were close friends of their children; (3) That plaintiffs also who had grand children who near and "not across town" and were, therefore, very able to make visits – even relatively brief one. She advised that for these reasons and many more, the only thing she told that would stop this decision was if the residence was damaged to a degree that it could not be rebuilt. In a text to Watts on May 21 plaintiff Tyrene told Watts that plaintiffs had hired both a structural engineer (who was very highly rated) to advise them and a mold removal expert to advise how to safely remove the mold if the structure was able to be rebuilt to a habitable condition. On June 21, 2019 the plaintiff again contacted Watts by text and advised him the engineer had begun his testing, which he believed wouldn't take very long to complete and would be able to write his report and findings. He also advised Watts the plaintiffs were working with the City of Oklahoma City (hereafter "the City"), to restore the residence to habitable condition, which because

of its dilapidation the City had advised plaintiff that they were in violation of the City's safety code(s) and that the City was getting ready to put the structure on a demolition list if there was any delay in starting a restoration.   The engineer's testing was in fact completed on June 29, according to the report.  Shortly thereafter plaintiff received  the lengthy structual analysis report,  of which he advised Watts and then sent both he and Ms. Timberlake copies of not just the structural report, but also copies of the fungi report. The  copies  of  these  reports'  production  coupled  with  a   July 9, 2019  text  in  which Plaintiff Tyrene further discussed with Watts by both telephone and text to Watts that the engineer's  structural  analysis  found  the  residence  could  be  restored  *if*  certain  things  he recommended  were  done:  to  wit:    (1)  that  all  removable  mold  be  removed  from  the premises  and  (2)  that  any  wooden  structure  such  as   wooden  stud  walls,  rafters,  LVO (main supporting beams) and the like that were shown to contain fungi be replaced. It also discussed the mold report and Plaintiff Tyrene  further advised Watts that she would send him  by mail and  also, text message  a copy  of both the engineer's report and the City's safety violation report in which they made the threat of demolition.   The "tearing off" of remaining roof shingles and rafters had been commenced on June 22, 2022 day.  Watts was so advised and thereby  had full and adequate knowledge of not only the beginning, but also, of the entire progression of  the rebuilding process. During the 2019 settlement period.  See, note 4, above.

This continuing information not only included the evidence of plaintiff Kenneth's purchase of material and personal labor performed in the rebuilding of the residence as

given

 in detail in Exhibit 1, see note , it continued with advisements to defendant of contract labor hired to complete the entire roof and rebuild the entire top story of the residence, replace the back portion of the downstairs and rebuilt interior wall framing that been destroyed by the fire itself or inhabited by growing as per the engineers' analysis and proper remediation practices.  The invoices ("notice") f for this contract repair were in fact made as the construction company completed *each* stage of the reconstruction process, e.g., (1) complete rebuild of the top story including the roof structure and shingles,(2) then rebuilding the interior walls of the second story, (3) then rebuilding the entire back part of the downstairs, (4) then replacing windows and doors, including new garage doors, (5) then replacing all soffits, outside siding and brick repair to the front of the residence and finally (6) other lesser but necessary repairs, e.g., contract was also let to a separate company, which removed or repaired all concrete damaged in the fire.  All interior plumbing damaged in the fire was repaired by yet another contractor.  All these invoices were sent when incurred to both Watts and Timberlake, as had been done in the same manner as  π K's proof of loss for his individual work done on the reconstruction.

*All* these loss damage repairs of work and material purchase, which were incurred and *were sent* by plaintiffs to the defendant's agents Watts and Timberlake, but none inexplicably ever timely paid, causing plaintiffs to have to expend all their disposable income and savings (401K withdrawals, income from the sale of personal property, e.g., several "collector automobiles", and any other ways) to raise liquidity for payment of

these contract repairs that had been completed.  Defendant's refusal never to pay or even give their reason(s) therefor actually made to plaintiffs repeated requests for an explanation made until the reason made known in Ms. Potts May 11, 2022 letter, which was that the  plaintiffs never gave the required notice of electing the reconstruction of the damaged residence *rather than* using the total demolition of the damaged residence and building a totally new structure on the same site.

When the insurer failed to timely pay plaintiff Kenneth's payment for labor and materials, plaintiff Kenneth at first believed  Watt's explanation that he (and/or the company) had  not received the necessary documentation of proof of loss of that portion of the claim in order to indemnify the insured was false. In truth defendant had received such proof of loss on both repeated texts (also provided to counselor agent Timberlake) *and* by associated telephone conversations with Watts beginning in early July and continuing through January, 2020.  At two separate times during the attempted settlement, beginning when plaintiff Kenneth first furnished them to adjuster Asah Watts as they were received upon completion of certain stages of the reconstrouction., and later when Watts could find them (the previously produced invoices, etc., that had been earlier again produced by Plaintiff Kenneth.  They were all (i,e including his own and that of the various contract laborers) recopied and again made available by both hand delivery to Watts, but also, by mail to Timberlake and mail to the defendant's main office P.O. Box, which had been provided for that purpose by Watts.   In plaintiff Kenneth's third attempt, thINVOICEe information was itemized in detail with dates and use of each material

purchase and the dates and hours worked with regard to the reconstruction of the residence.  The total for these unpaid reconstruction costs for both labor and materials previously paid by or performed by him and/or members of his immediate family owed to him personally was the sum of  $22,656.09 for materials paid by him and the number of hours he or his family.  It was only when defendant's current counsel Potts wrote the May 11, 2022 letter in reply to plaintiff's counsel's letter of March 16, 2022 and stated at page 6 that the defendant's  "reasons" for its  refusal to pay *any* indemnification based upon reconstruction of the ruined domicile.  Defendant,  rather, would reject any settlement would unilaterally settle with only only opt to pay only upon taking the demolition the reconstruction rather than demolition.  In this letter received on or about May 115, 2022 plaintiffs first learned that the defendant's reason was *not* lack of proof of loss with regard to reconstruction as Watts had asserted, but rather, was because "the Turoczi's *never reported* that. they were "abandoning" the plan to demolish the existing home and build a newly constructed home".  Defendant   first quotes with highlight the relevant policy's requirements for such payment:

> b.  We will pay under the additional coverage only if:
>
> (1) The covered loss occurs during the policy period:
>
> (2) All reasonable means were used to save and
>       and preserve the property at the time of and
>       after the covered loss; and
>
> (3) We receive prompt notice of the covered
>        cause of loss that is alleged to have resulted
>        in fungi, other microbes or rot.

At this point the Potts' letter makes the above-referenced statement with regard to defendant's

failure to pay:

> "Importantly, there is *no record **at any point*** during the 2019 claims period that the Turoczis ***ever reported*** to Travelers they were abandoning the plan to demolish the existing home and build a newly constructed home on the property, Nor did you *mention this in **any** of our prior communications*."
> While Mr. Turoczi's Verification ,the itemized summary provided indicate that the Turoczi's now seek payment for their efforts and expenses for mold /fungi issues developing *at the property* or ***of any*** related efforts to remediate after the claims handling period ended there was no evidence of
it uary 2019 through August 2019, there is also *no record* the Turoczis ever notified Travelers of *any* mold fungi issues developing at the property\ or of ***any related efforts to remediate*** after the claims handling period ended or when Ms.Timberlake sent her final letter to Mr. and Mrs. Turoczi in late July 2019, and the photographs, receipts, summary documents and other materials included in your March 2022 letter were ***never** previously* submitted to Travelers' either." (Emphasis added.)

Ms. Potts' May 2022, letter was obviously invoking numbered paragraph "3" of the policy

provision above quoted, because it is not controverted that the claimed loss did occur

"during the policy period" and because it is also apparent that the Turoczis did, especially

in the period from Christmas 2018, through 2019 use all reasonable means to preserve the

property at the time of the covered loss, not just from fire, but from dangerous fungi and

other

The fire loss at this time was challenging, but the Turoczis were hardy and up to

the task of recovery from hardship. Ms. Potts' letter further admits that ***if*** the information

as required ***had been provided*** *to insurer* during ***any*** *point* of the 2019 claims period it

"would have become apparent to Traveler's that" the insured did not intend to demolish

the structure and Traveler's would have had the "opportunity" to readjust the claim and base it upon the cost of "partially reconstructing the damaged portions of the home on the existing building".

The above quoted statement/letter in which Ms. Potts makes these allegations discusses

plaintiffs acts of failure *as insured* , not as insurance companies.  She states as to their failures during the 2019 "settlement period"  when according to the agent:

> (1)  there is, also, no record that  the Turoczis ever notified  Travelers of any mold/fungi issues developing at the property."

> (2) or of related efforts to remediate.

Pott's May 2022 letter reasons that since plaintiffs did *not* give *prompt* notification that they "did not intend to demolish the property or rebuild a new house" as "estimated by Traveler's *"in processing this claim", but rather chose to rebuild the damaged structure"* Traveler's duty to provide coverage was not "triggered" for that particular loss. This statement coming from a legal counselor concerning both the acts or omissions of the insurers' claims adjuster (Watts) and the legal counsel assigned to assist the settlement of this case (Ms. Timberlake) admits that *if* insurer had been somehow advised the plaintiffs' intent  was to rebuild, such a coverage would have been "triggered" for that particular loss.

## II.  Reply to Motion's  Brief in Support.

The Motion's supporting brief states at pages 3-4 two separate grounds upon

which this Court should dismiss the action on the merits of the pleading:   (1) that the claims are extinguished under the "applicable" statute of limitations and (2) that the plaintiffs have  plead only a single cause of action and have failed to plead *any* allegations establishing a corresponding breach of contract law.   It is based on the defendant's allegations of statute of limitation's effect and a lack of allegations establishing a contract claim that a Rule 12(b)(6) dismissal is appropriate, because the petition does not state a claim upon which relief can be granted.   The following argument will first address defendant's allegation that the petition as presently drafted does not plead any allegations which state a claim for "breach of contract", which is necessary to an insurance bad faith settlement claim.

**A.  Plaintiff's allegations do allege facts, which not only establish a claim for breach of contract but has plead allegations which, if taken as true, establish a claim that the policy *as applied by* employee agents of this defendant render the otherwise valid agreement to be applied in a continuous and repeated manner that places the insurance policy agreement in violation of clearly stated language of Oklahoma statutory law specifically governing the conduct of insurers and their agents that is contrary to its stated policy of treating Oklahoma's insured citizens in a prompt, fair and equitable manner in its settlement process(es), and therefore establishes not only a mere "breach" of contract, but transforms that singular <u>"policy of insurance" into an "unlawful" contract under clearly-articulated state law.</u>**

Oklahoma's law of both tort and contract can be plead/raised by a common set of facts.  In this matter the plain reading and application of the wording of both applicable state and common  laws and their purpose, a/k/a "public policy", reveal that the acts and/or omissions of multiple agents of defendant in the settlement of this claim violate

both the statutory language contained in Title 36 of Oklahoma Statutes, but also the law of Title 15 of those statutes.

The specific statutory laws that were violated by defendant *and* it's agents were those  with not only clearly stated language, but a clearly stated public purpose and as to the insurance industry are chiefly in Title 36 of the Oklahoma Statutes.   in 36 O.S. §§ 1250.1, et. Seq. ("the Act"), which specific acts are referenced throughout this reply, but especially those of 36 O.S. § 1250.5 which govern the conduct of insurers in the settlement of claims and are shown to have been violated by defendant's agents/employees acts and omissions.  These violations of Title 36 statutes herein but also of the public policy they were passed into law to promote, at the same time violate the clear language and legislative intent of  15 O.S. § 211, which plainly states:

`        "Those statutes are unlawful which are:

        1. Contrary to an *express provision* of law.

        2. Contrary to the *policy* of express law, .   .  .."  (Emphasis added.)

Those subsections of 36 O.S. §§ 1250.1 et seq.,which are referenced throughout this reply are "express provisions of law".  If the law is applied to a contract (such as an insurance contract), the  *application(s)* of which violate not only the plain language of the statute, but also the policy it is passed to control certain acts or omissions (here that insured are afforded insurance settlement claims in a prompt, fair and equitable manner), then *a fortiori* contract itself is an "unlawful" contract *vis a vis* that particular settlement proceeding.  Stated differently, defendant's agents conduct herein is more than a "breach"

of contract it is the use of a contract to help violate existing law and, therefore, under Title 15's express language not only an unlawful act, but an unlawful contract negating any use of its' terms such as the contract's period of limitations which is a part of this motion to dismiss.

Any statutory interpretation [ "is governed by legislative intent, and legislative intent is ascertained from a statute's plain language. If a statute is plain and unambiguous, it will not be subjected to judicial construction, but will receive the effect its language dictates.

*Brisco v. State ex rel. Bd. of Regents of Agric. & Mech. Colleges*, 2017 OK 35, ¶ 10. Defendant's motion would have the Court accept the notion that Title 15 section 211's application means how the contract that underpins the issue is written, not, also,  how it is applied such as in an issue of insurance claim settlement in a specific claim as that which is before the Court. The plain language of the Act, however refutes any such argument (failure to assert a "breach of contract") by the language of it's  Section 1250.3, which governs the "applicability" of the Act and which states:

A. The provisions of the Unfair Claims Settlement Practices Act *shall* apply to all claims arising under an insurance policy or insurance contract issued by any insurer.

B. It is an unfair claim settlement practice for any insurer to commit any act set out in      Section 1250.5 of this title, or to commit a violation of any other provision of the Unfair      Claims Settlement Practices Act, if:  1. It is committed flagrantly and in conscious      disregard of this act or any rules promulgated hereunder; or     2. It has been committed      with such frequency as to indicate a general business practice to engage in that type of      conduct.  (Emphasis added.)

17

It is plaintiffs' assertion that the acts of settlement treatment in the settlement were both flagrant and repeated numerous times as in defendant's assertion that the many separate times the work of plaintiff and contract labor notified to defendant and the attendant proof of their billing given to both adjuster Watts *and* Ms. Timberlake were denied in order to establish defendant's claim (which was contained in Ms. Potts May 11, 2022 letter—three years later) that defendant was ***never*** notified of such work.

It is further plaintiffs' assertion that by the language "*shall* apply to all claims*"* its' application is to, as stated, "all claims".  As the word "shall" is mandatory/imperative and not subject to the discretion of any insurer,  as per *Oklahoma Alcoholic Beverage Control Bd. v. Moss*, 1973 OK 45, the Act's provisions and especially those of it's Section 1250.5 are by law a *part of* any Oklahoma insurance contract and if  *any* adjuster's or lawyer's or any other insurer agent's conduct is violative of that Act it is by law also a violation ( i.e., "breach") of that contract of insurance involved.  Therefore, an application of Oklahoma law of the Act when applied to the facts herein does show that the Act's violation occurred in the settlement process, by defendant's omission of timely payment coupled any notice of the basis of such non-payment  are proof of a breach of contract between the parties to it.

However, if the Court deems it necessary plaintiffs will request that they be allowed to amend and to specifically plead that all facts now before the Court also constitute a breach of contract.

**B.  Defendant's conduct in failing at *any* time of the settlement process  to  advise plaintiffs that it had *not* been given some form of "notice" that plaintiffs  had**

**"elected" to rebuild/restore the damaged structure, given the many separate and continuing instances discussed above that  this "required notice" by plaintiffs in the submission of contractor's bills for reconstruction had in fact  occurred when plaintiff's *promptly* and *repeatedly* advised it of the work that was being done by both plaintiffs and hired contractors and by *promptly* furnishing defendant on *multiple* occasions of the contractor's billing statements for such work, as well as furnishing in these multiple occasions documents that showed both materials plaintiffs had purchased for the reconstruction and the actual work  they  (and other family members) had done in helping the hired contractor's reconstruction.  All such acts did inform defendant plaintiffs were *not* agreeing to defendant's often proposed "demolition plan".   In fact plaintiffs had not gotten any notice of their required notice "duty" to elect reconstruction and other remediation efforts *until* Ms. Potts inserted that claim in her May 11, 2022 letter to their counsel.  However, not only did their advisement to adjuster Watts in January, 2019,  less than thirty days after the loss occurred meet any such duty, but also their conduct beginning in May, 2022, less than six months after the loss'  renders the claim of "lack of notice" an invalid defense to their otherwise undisputed "obligation" to *timely* reimburse plaintiffs for this loss based upon the submitteed notice of reconstruction costs.  The repeated "notice" from plaintiffs, which actually began in  June, 2019 and continued through the Summer of that same year as shown by their timely texts and submission of incurred building  costs to defendant's assigned adjusters and legal counsel that should estop defendant  from asserting a defense of an absence  of required notice.  It was defendant who did not give any "timely" notice of that assertion to plaintiff's in order to use it as  a defense of their conduct to deny timely and legitimate <u>indemnification to their insured as it attempts herein.</u>**

The conduct as outlined above and which is as is verified by both plaintiffs in this regard meet any insurance policy requirement of timely notice to employ reconstruction of the damaged property rather than the "planned demolition."  Notice of election to rebuild that was  by defendant. made on multiple occasion and done timely was wholly denied

The favorite tactics of the defendant in this matter has been to deny receipt for notice from any insured  and in whatever arena of insurance they might desire to have "their whenever possible .  The Turoczis delivered  twice .the invoices for the debris and

mold labor (as the company had told them to do) They had given to help remediate the

local holocaust they and their neighbors had lived with.  Twice the defendant's agents had

lost or misplaced.  A third time plaintiff Kenneth Turoczi delivered yet another set this

time with all work itemized and for rebuilding materials he had purchased to assist

Travelers.  To date after several years of repeated effort, he has still been paid nothing and

turns to justice for his relief.

**C.  ANY APPLICABLE PERIOD OF LIMITATION OF THIS ACTION,
WHETHER BY STATUTE OR UNDER THE COMMON LAW OF THIS STATE,
IS OTHERWISE TOLLED BY DEFENDANT AND VARIOUS EMPLOYEES,
WHO KEPT THE REAL REASON FOR THEIR FAILURE TO PROPERLY
REIMBURSE PLAINTIFFS AND/OR EITHER OF THEM OR TO TREAT THEM
FAIRLY IN THE
SETTLEMENT OF THEIR LOSS WITH THIS INSURE**

~      Response to this defense of judicial time limitation is brief  and to the point.

Plaintiff's motion rests upon stated breach of law, both statutory and common.  This

Response merely answers  the bona fides that the pleading of these complicated facts in

no way states a cause of action,  Plaintiffs respond this is incorrect on at least three

grounds.

1.  Movant makes the statutory limitation of the action in several ways citing several

sources.  All these defenses are with respect to the claims of Mr. and Mrs. Turoczi who

brings this action.  There argument when these different legal rights arose .and thus would

begin to "run".   There may be a disagreement or at least plausible theory  when different

ones may have arise.  One thing is certain.  If the plaintiff's first knew of the wrongs in

question, then the limitation on its judicial resolution would commence.  12 O.S. §95(1),

(2) & (3).

Similarly, it should be in common agreement that none of these theories of judicial relief until the Honorable Sarah Potts E. Potts public comments as to the operation of various efforts in Oklahoma, County, Oklahoma during the harsh Winter of 2019

**D. CLOSING.**

Having fully answered, plaintiffs respectfully asks this Court to deny this motion and allow a reasonable discovery with respect to all parties to proceed.

_____
Gary W. Gardenhire, OBA #3235
1005 Fountain Gate Cir.
Norman, OK 73072
Tel.: 405-701-3398

**CERTIFICATE OF SERVICE**

I hereby certify that on February 27, 2023, a true and correct copy of the foregoing document was served upon the following via the Court's electronic system, electronic mail, and/or U.S. Mail, postage prepaid thereon to:

Sara E. Potts

Doerner, Saunders, Daniel, *et al*
210 Park Avenue, Suite 1200
Oklahoma City, OK73102

-and-

Michael S. Linscott
Alexandra J. Gage
Williams Center Tower II
2West Second Street, Suite 700
Tulsa, OK 73403-3177


Gary W. Gardenhire
_____