# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

(1) KENNETH TUROCZI and )
(2) TYRENE TUROCZI, )
                         )
         Plaintiffs, )
                         )
                         )
vs. )    Case No.  5:23-CV-00095-JD
                         )
                         )
(1) TRAVELERS COMMERCIAL )
INSURANCE COMPANY, )
                         )
         Defendant. )

## PLAINTIFFS' AMENDED COMPLAINT

### (Proposed)

Gary W. Gardenhire OBA 3235
1005 Fountain Gate Circle
Norman, OK 73072

Tel.:       405-701-3398
Mobile:    405-574-0906
E-mail:     ggardenhire7@gmail.com

Attorney for Plaintiffs,
Kenneth and Tyrene Turoczi

## <u>TABLE OF CONTENTS</u>

                                                                        **Page**

**I. INTRODUCTION** …………………………………………………………**1**

**II. NATURE OF THE.ACTION**……………………………………….....**2**

**III. PARTIES**……………………………………………………..…**9**

   A. Plaintiffs………………………………………………………….…………… .9

   B. Defendant………………………………………………….……… ..10

**IV. JURISDICTION AND VENUE**……………………………………... **10**

**V. FACTUAL ALLEGATIONS**……………………………………**12**

     A. Claim Initiation  and Estimation Period: DECEMBER 23, 2018 -*……….12

     B. Mold.. Remediation . Period:  MAY 20,. 2019 - ** …………...………..…12

     C. Reconstruction Election and Rebuild of Residence Period:
       JUNE 24, 2019 – JUNE 18, 2022 ***…..………………….……………15

.**VI.   CAUSES OF ACTION AND CLAIM FOR RELIEF**…………………….. 19

**EXHIBITS:**   The referenced Exhibits hereto were all previously provided to Defendant as they had been referenced with the same Exhibit numbers as are used in this Amended Complaint document.   If any additional transmission of these exhibits are necessary, Plaintiff will comply with that directive.

* This ending period is not able to be determined, inasmuch as there was no finality in some areas such as, e.g.,  with respect to the mold claim  which  was  made, but  the defendant apparently  believed that timely notice had not been given that there *was mold condition which existed.*  This is yet another "lack of notice" rationale to non-payment even though  it had been given access to the entire structure for the entire month of January, 2019  during which time mold was visible, and  further given written notice  given on February 5, 2019 to  Asah Watts  that   it appeared  to be growing and  yet again in early April, 2019 when it was given a second written  notification that

Plaintiff Kenneth "needed to talk to someone about the mold condition which existed". adjuster was going to handle it?  Defendant never responded to that request, but used its' " lack of notice" as a defense to paying monies under Plaintiffs' mold coverage .

**  Same as "*" above.  For the stated reply to his inquiry that the mold would be resolved by "the demolition of the home" and was never further answered.  The attendant notice that defendant had hired a mold inspector to do an inspection to see if the mold could be controlled and to report  and if it could be repaired what should be done to control/eradicate that condition.  This is "also" further evidence that no "demolition election" was ever made in this settlement process, because Plaintiffs would not make such election given the report (furnished to defendant on June 25, 2019 saying it *could be* repaired)  established Plaintiffs' intent to reconstruct, which they did in fact begin on or about June 24, 2019 with their roof "tear off".

***  This reconstruction of the damaged residence began on the above date and ended when Plaintiffs were forced to sell the  structure at a loss, because they had exhausted any available liquidity given Defendant had renegged  on indemnification  for labor and material to do  construction that they *had* paid for using their own funds.

COME NOW Plaintiffs Kenneth Turoczi and Tyrene Turoczi ("Plaintiffs" or "Plaintiff Kenneth" or "Plaintiff Tyrene", respectively when reference is made to a single party) and for their Complaint and cause(s) of action against Defendant Travelers Commercial Insurance Company (hereafter, "Travelers" or Defendantt) do allege upon their information or where stated their belief,  and state upon their oaths to this Honorable Court as follows:

## I. INTRODUCTION

1. As has heretofore been stated by Defendant in its earlier dismissal motion, this matter does arise from a policy of insurance issued by Defendant to protect Plaintiffs from casualty losses, which included that caused by fire. The policy included a basic homeowner's policy for the indemnification of that loss, but also, certain additional coverages and endorsements that had been purchased in addition to the basic homeowner's coverage.  The policy at issue herein has already been placed before the Court by Defendant as its' dismissal motion's  "Exhibit 1" and that document will be referenced in both statement of fact and argument of this amended complaint as "the Defendant's policy" or "the policy".   The policy at its page numbered "2" states the property coverage(s)  and the attendant limits of indemnification liability for each category of coverage it had calculated with regard to the loss at issue.

2.  As Defendant also stated in its' earlier dismissal motion, this loss occurred in a fire in Plaintiffs' residence located at 11701 Silvermoon Drive, Oklahoma City, OK (which plaintiffs will hereinafter refer to as the "residence").   This fire started in an

1

electrical source in the house's den area at the back of the structure. The fire after igniting quickly spread and became a "Five Alarm" blaze, which in accepted firefighting parlance means  "a fire that is so large and intense that it requires the presence of many firefighting units to try to contain it".  See, Idioms, The Free Dictionary.  That idiom was correctly applied here in that at Plaintiffs' home fire there were at least four heavy "ladder" pumping units and for some time a fifth unit; and it took over two hours into the evening to quell the blaze.   The firefighters had left by around 8:30 p.m., but when it had started up much later in the evening as reported by a neighbor, one unit had to return to quell the "start up" blaze at the site by pumping even more water into the piles of debris.   The significance herein of the loss description is the sheer enormity of ash, water and other debris that was left behind and ultimately had to be removed and the area completely cleaned as a part of the "loss remediation process" and which  process defendant was required to begin almost immediately even before Defendant's inspection  for loss estimation purposes had concluded at the end of January, 2020. See,  Exhibit 1:  Interior debris *circa* December 26, 2018 ( interior and staircase).

## II.  NATURE OF THE ACTION

3.  Following the quelling of the fire that evening 8, Plaintiffs and their family were forced to seek shelter from a cold winter night with temperatures near freezing. Given that they had their surviving animals with them, they went to the shelter that had been founded by Ms. Turozi's grandparents and relatives.  The church shelter located at

3440 S.W.. 25th Street, Oklahoma City,  hereinafter the "Southwest Cathedral" did not at that time have heating or water available, but did afford some protection from the elements.  The next day Plaintiffs attempted to contact Travelers to report the loss and get the claims process started in order to get whatever assistance was available.  Their only means of communication was a single celluar telephone, which Mr. Turoczi had obtained from his employer, Mondelez International, a food company for which he was a class A delivery truck driver, to be used when Mr. Turoczi was traveling for the company. The rest of their communications,  three other personal celluar phones and, most importantly, three personally owned computers had *all* been totally destroyed.

    4.  Besides their extremely limited communication problems Plaintiffs' situation was made desperate, because on December 23, 2018, they actually had only the "clothes on their backs"  and most of these, such as a pair of house shoes, one set of sweat clothes and a blanket (this was their only shared "coat") had been given to them by their neighbor.  None of the children, except Milanni the youngest grandchild, even had shoes. The rest had only socks, but they too were all wet. Ms.Turoczi used Mr. Turoczi's work phone and contacted Travelers whose number had been stored on that phone in an earlier contact with Defendant. It was around midday when the Travelers claims personnel answered.  Ms. Turoczi told that person she needed to submit a fire loss claim and the representative took her information, including the number of this only remaining mobile phone device.  Travelers, also, advised that a representative would soon contact them, but  only"after Christmas".   Travelers representatives did,

however, soon come to the ruined residence before Christmas Day where Plaintiffs were trying to secure the property and salvage any belongings or documents. Travelers delivered to them an emergency assistance check, some of which was used for personal needs, but some of which was also used to help secure the property such as covering broken windows. The several representatives that came also left some paperwork for Plaintiffs to begin listing personal property ruined or lost in the fire. On December 26, 2018' Plaintiff contacted Tracey Stokes, whose number she had been given to contact, because Ms. Stokes would be the adjuster performing contents adjustment matters (i.e., the papers she had been left at the Traveler's initial personnel visit). Importantly, in their discussion the matter of Plaintiff's limited communication ability was discussed. The context was that Ms. Stoke's had brought up the subject of the temporary hotel arrangements that Travelers had "set up". These arrangements had been set up on Christmas eve, but the hotel was unable to "contact her" (Ms, Turoczi) to confirm the reservation because the hotel was apparently sending that information by email, which had not been answered. At that point Plaintiff Tyrene stated to Ms. Stokes:

> "That's great now but nobody *texted* me the info, I *told them I* **had no email** (because the fire had destroyed it) .". .. (Emphasis added.)

5. The same issue arose again only five days later on December 31, 2018, when Plaintiff Tyrene contacted adjuster Codey Monzingo, whose name and contact number had been provided by Ms. Stokes. Mr. Monzingo was the adjuster who was then going to be the overall property adjuster, i.e., designated as her "main point of contact". In that

conversation the same issue as had been discussed with Ms. Stokes as to *capable* methods of communication with the Plaintiffs arose.  It was a lengthy discussion, done by text messaging, about various issues of claim settlement; however, it included Plaintiff asking Monzingo for a copy of her policy (which had been destroyed in the fire) and an ALE check for housing other than where they were currently staying. Monzingo replied in a lengthy discussion that he *would* contact yet *another* person involved in her claims process by the name of one  "Shane Friddle", who would be thereafter "involved" in her claim by overseeing the payment of  checks that had been issued in partial payment, e.g., of additional living expense ("ALE").   Plaintiff explicitly advised these additional adjusters that her *only* means of electronic contact was this single celluar phone and she preferred text messaging, which preserved a visual record of any  communication without accessing Mr. Turoczi's work computer. The point is that the text method of messaging Plaintiffs *repeatedly* requested would allow the same thing that a "workable" email would accomplish without involving/ interrupting the company's computer system. Plaintiffs  did not then possess such a separate, workable device with a program that would receive a personal email message, such as *punkphillyokc@gmail.com,* because all those had been destroyed in the fire and the sole celluar phone they could use had a different address, which was that of the Mr. Turoczi's employer.  Ms. Turoczi explained:

**5**

Plaintiff Turoczi:   "We only have his (Mr. Turoczi's) work phone and he has to clock  in to check his telephone messages so if  you could all text it would be great."

Mr. Monzingo:      "OK, I'll let *them* (his manager Mr. Bogosh and other employee personnel involved) *know*."(Emphasis added.)

6.  The third time that this need to be communicated with via text messaging and not email was made known was to yet another assigned adjuster of defendant and was still within the first 30 days of the fire loss.  This was when Asah Watts ("Watts") took over Mr. Monzigo's duties and met with Plaintiffs in  January, 2019, the first time at the burned residence and the second, approximately two weeks later when he picked up some receipts (ALE receipts) at the travel trailer next to the Church where they were staying. In one of the in-person discussions with this new adjuster where the process to date was discussed, Plaintiffs did discuss their desire to be notified by text and not email.  As they had done with the earlier two adjusters, Stokes and Monzingo, Plaintiffs  also  explained to Watts the reason such communication method was necessary.    Plaintiffs advised Watts that after hearing the reason for using text messaging communication, both these adjuster's had  complied with the Plaintiffs' request and they were in fact able to receive necessary communications "immediately". Mr. Watts said he too would comply, but he, however  "didn't like to use texts" to communicate.   He continued to state this dislike in regard to subsequent issues involving texting and in a February 8, 2019 letter (Exhibit 2)  stating Defendant had "continued to work as quickly as possible to resolve your" claims.   But Watts added:

**6**

"(f)urther, your preferred communication (text messaging) has *not been helpful* in continuing to move this claim forward." (Emphasis added.) Importantly, Watts did not bother to give any specifics  as to why texting was "*not* helpful" in the premises.  He also did not address how texting had in this very settlement process  actually  been *very helpful:*   by explaining to earlier settlement adjusters why the email address that initially was being used by defendants agents in this matter: *punkphillyokc@gmail.com* was *not adequate* to use to communicate, because it was on a computer that had been totally destroyed in the fire and incapable of receiving messages after that loss date. This helpfulness (explaining to each of three separate Traveler's adjusters on different occasions) why an email address  that had been provided  to Travelers long before the loss at issue could not after that loss be used to receive messages transmitted to that address)  beginning the day after Christmas and four days after the holocaust fire that had completely destroyed the home that they had only recently totally remodeled.  This inability to communicate was not only because of the fire destroying its' content, but also, because of the fact that the password to retrieve any data that  *arguendo*  still existed and could be retrieved  was stored only on that computer and could still not be accessed because it was not available to open the system. n.  1

---

**n.  1 -**  The Plaintiffs had given this address to Travelers years earlier,  when they had their first homeowner's policy with the company.   They left Travelers insurance  for approximately two years *circa*  2015-2017.  In late year 2017 they returned to Travelers and resumed their homeowner's coverage with the company. At that time they again  began to use the *"*punkphillyokc*"* address, which was used with Travelers *for the company's direct billing to that address*.  It was used  for Travelers only for this purpose or on occasion to send Travelers information that it needed or had requested.

**7.**    But as the settlement process continued Watts, also,  inexplicably continued to request that he be allowed to send information via e-mail to that same address even after he had actual knowledge it could not be accessed by the recipient, even if the machine itself was capable of receiving it.    An example of this continued frivolous request was when Watts made it to Plaintiffs with respect to their previous request  ( of June 25, 2019) that they be given a complete copy of their claims file.    Watts wanted to send the claim file to that same email address, which he had previously been advised on numerous occasions was incapable to store and/or allow access to an email sent to it.  See, Ex. 3: texts of June 24, 2019 through July 9, 2019).   Besides these written questions about why their request for a copy of their claim file was not sent even with their direction where that information should be sent, (*id.*,  July 9, 2019 message to Watts), their file was never sent to them during that "settlement period".  Ms. Turoczi, after the July 9 message's  direction, also attempted to contact Watts and be given an explanation why  after all their previous explanations of why *not* to use this email address -- Defendant continued to  allow him to attempt  to send  such information by email and not text or at least use  certified mail.  Stated differently, if Defendant  really desired its' insured  to be given knowledge of a communication  from it but allowed such conduct (ignoring Plaintiff's request to be texted) to occur in the first place, let alone allowing it to continue many times, could that be deemed and fair treatment?. Watts never responded to Ms. Turoczis telephone call about her claims file.  Nor did he return calls or messages throughout the rest of July and into August, 2019, concerning

both her claim file and Watts' frivolous conduct of continuing his desire to contact and send important Travelers information to the "punkphillyokc" address.

8.  This "nature of the action" explains the development of the actual nature of the settlement process which was employed by Defendant  and used  throughout its' stated "settlement period" by its adjusters and legal agent(s) in employing that process. Many such acts and/or omissions which occurred in that application  facially violate both the plain reading of Titles 15 and 36 of Oklahoma statutory law, which declares such conduct by any insurer doing business within this State to be in violation of Oklahoma law as well as the public policy underlying that law's adoption.

Additional factual references not made here or in the Introduction  will be made in the Factual Allegations category of this Complaint.

**III.  PARTIES.**

**A.  <u>Plaintiffs.</u>**

8.  Plaintiffs Kenneth and Tyrene Turoczi are married together as husband and wife and at all times herein resided in Oklahoma City, Oklahoma County, State of Oklahoma,. wherein they jointly owned a residence located at 11701 Silvermoon Drive, Oklahoma City, OK.  All acts or omissions by defendant herein concerning its insurance coverage of their loss(es) vis a vis this residence's property damage occurred within Oklahoma or  Cleveland Counties  and  within this  Court's jurisdiction.  After the fire loss,  the Plaintiffs  and  their  family  in 2020 moved  to a  rural property  they

had purchased in southern Oklahoma City following the fire and during the attempted reconstruction of the Silvermoon residence's habitability. In 2018 Plaintiffs had purchased/renewed a homeowners policy that made it and its application occur within the jurisdiction of this Court.

**B.   Defendant.**

9.    Defendant, Travelers Commercial Insurance Company, is a foreign insurance company, now known to be formed and having its business in the State of Connecticut. As Plaintiff's stated in their State Petition it has at all times herein been licensed to practice and in this case has practiced as a purveyor of homeowner's property and casualty insurance coverage within this State and within the jurisdiction of this Court. It provided for real and valuable consideration given by Plaintiffs the security of indemnity for losses provided in the policy stated and identified herein in numbered paragraph 1, above.

10.    Whenever in this Complaint reference is made to any act, deed, or transaction of the defendant insurance corporation, this allegation means that it includes any personal act, deed, or transaction done by or through any of its officers, directors, agents, employees, or representatives while they were actively engaged in the management, *direction* or *control*, of the corporate entity's business affairs.

**IV. JURISDICTION AND VENUE.**

11.    This matter comes before the Court based upon Defendant's Removal under the provisions of 28 U.S.C. §§ 1441 and 1446. As stated above, Defendant was

licensed  to practice within this State, but Plaintiffs also agree and concede that this alone does not defeat federal jurisdiction based upon complete diversity.    They similarly agree that based  upon uncontroverted facts the acts of Defendant were conducted primarily within this Federal District and, therefore, venue is proper.

12. It is in conjunction with the original notice of removal and in the attendant motion to dismiss of the removed state action, Defendant argued that Plaintiffs had alleged but a single cause of action:  that of the breach of the affirmative duty of good faith and fair dealing. That was and is inaccurate.  What the Petition was attempting to assert was a violation of *both* the statutory Oklahoma law governing insurance practice (36 O.S. §§ 1250.1, et. Seq. , the Oklahoma Unfair Claims Settlement Practices Act ("UCSPA" or "the Act) *and* Title 15, Oklahoma Statutes, due to numerous violations of specific provisions of the Act as to what constitutes and unfair and hence an unlawful conduct in the insurance industry.  Such violations are also governed by 15 O.S. §211, which provides that contracts are unlawful which are "contrary to an *express provision* of law" or "contrary to the *policy* of express law though not expressly prohibited" are "unlawful".  (Emphasis added.). Plaintiffs did then and do now contend that a violation of a law (the Act) whose clear purpose is to ensure fair play and substantial justice within the insurance industry is just such a contract as the Defendant's policy, whose **application** makes it contrary to law (the Act) *and* the public policy underlying it and hence an action *ex contractu* as well as one *ex delicto*.  However, because the Court has allowed contract to be pleaded explicitly that issue does not need to be addressed.

11

## V.  FACTUAL ALLEGATIONS.

**A**.  Claim Initiation  and Estimation Period: DECEMBER 23, 2018 - >.

13.  These facts are mostly covered in the Nature of the Action paragraphs, above, but will be  addressed further if needed  in the respective cause of action involved.  A fact not specifically included in the Nature of Action paragraphs was an explicit description of a fact that was also discussed in person with adjuster Watts relating the need to be able to communicate with the insurer's agents.  That fact is that besides not having a personal email that worked Plaintiff Tyrene suffered from a medical condition of severe vision loss that required the reasonable accommodation of being contacted by text messaging as opposed to email, which communication  method Plaintiff Tyrene had from the initiation of the Plaintiffs' claim not always  received when requested.

**B**.  Mold Remediation  Period:  MARCH  –  JUNE 25 , 2019.

14.  While Defendant cannot with any credibility claim it *never* received *any* notice of a mold  problem during the "2019 settlement period" vis a vis a mold condition  and especially not that of  a growing or "*spreading*" mold at the site during that time, it seems to argue in support of the *tota*l failure to be *reasonably and timely indemnify Plaintiffs* for that condition and owes no indemnification whatsoever  in the premises. It was because this condition was not reported "timely" to Defendant that it, therefore,  does not owe and never owed any insurance indemnity in conjunction with mold.  Rather, Defendant argues it was somehow owed *only by* Plaintiffs who with their time, effort and personal funds had  already caused *all* remediation to occur.  But

undisputed fact is that Plaintiffs with their *very limited funds* addressed and finally did solve the problem in order to then be able tostart the reconstruction of the site. See, that transition of mold "repair" to residence repair at the following "Period", *infra.*

15.  With respect to the timely notification of mold, this period followed the Defendant's on-site estimation of the residence lasting most of the Month of January, 2019 in which it had exclusive "control" of the site and could directly observe the inception of the mold growth, which by February and certainly March, 2019 was in fact growing steadily worse. The first formal "notification" was by Plaintiff Tyrene to Mr. Watts on February 5, 2019 (i.e., *immediately* after Defendant's site inspection /control ended) when she advised him that he should have included the mold condition in his overall estimate of the dwelling loss, *because* it was necessary to "cure" the mold in order to put the residence back to it pre-fire condition. Watts *never* responded to any such advisement to him. A subsequent conversation about various settlement concerns including mold was February 18 when Watts advised Plaintiff Tyrene that she should "contact Ms. Timberlake to address your questions and concerns." Yet even another attempt to contact Travelers (since there had been no response) was on April 12, when Mr. Turoczi contacted the adjuster and asked what Defendant was going to do to address the mold – and if he would be the adjuster? Watts' *only* reply was vague when he stated that "the mold would be gone with the *demolition."* This was confusing, because neither Plaintiff had agreed to any "demolition" at that time.

13

16.   So, too, is Defendant's separate claim false that Plaintiffs failed to address *any* of the condition by their *own remediation* or control of the condition, which they were "obligated" to do under the contract.  This, too, is palpably an outright falsehood, because it again was *only* Plaintiffs who in fact did *any* remediation.  Certainly after Watts above-statement, they realized Travelers, without any explanation, was simply not going to do any thing about mold.  What happened after that time was that Plaintiffs, their children and certain hired contract laborers did all the remediation! They completed mold debris removal by working many hours hauling it in wheelbarrows to dump  into rented 42 feet dumpster.  This amounted to dozens of such containers. While Defendant paid for some "debris" removal (five containers) it did not honor any separate mold endorsement protection, for reason of "lack of notification".

17.   Plaintiffs, in turn, in order to stop the spread of mold hired a mold remediation company which advised both them and their separately retained structural engineer as to how to deal with the problem of model in the reconstruction of of the residence.  It was his report, along with the separate report of the engineer, which concluded the structure could be repaired,  *Both* these professional expert opinions were made available to Watts and, also, Sara Timberlake, at the time reconstruction work was undertaken.   *Note:*    The simple "notice"  at that time of  the retained engineer and mold experts' advice rebuilding was possible should be deemed to be their election to pursue reconstruction of their home and not demolition.  If not, it did become "actual notice" when in conjunction with these reports Plaintiffs sent notice of

14

not only the reports, but also, of a building permit  secured from  the Oklahoma City Development Services.   These "notices" were sent according to Watts' earlier direction(s) that any such communication should be made with Sara Timberlake.  Not only did they comply with that request (as they *always* had attempted to do), Plaintiffs, also, delivered separate copies of a "packet" containing these documents to him by regular mail and*, also,*  by hand delivery to Travelers' Oklahoma City Headquarters.

18.   For all this mold "remediation" required by – but not reimbursed by – Travelers Insurance, the Plaintiffs "paid" with both their own funds or own personal labor various vendors and amounts:  to include:   approximately  $15,000 for dumpster rental; $72, 540 debris removal, contract laborers in a more  specific amount to be determined and $600 for mold inspection report  and other related payments such as a private debris removal for which they were never indemnified by Defendant.

**C.**  Reconstruction Election and Rebuild of Residence Period:
      <u>JUNE 24, 2019 – JUNE , 2020.</u>

19.   This period began and coincided with the end of the "mold" remediation period, above.   As shown by both these reports, complete mold removal was a necessary predicate to happen, because without that condition precedent being fulfilled, the remaining wooden structures that had been "saturated" with the fungi would persist and probably grow.  This would greatly lessen a rebuilt homes commercial value as well as being a predictable and always-present health hazard.  At the immediate end of the structural engineer's analysis coupled with that of the mold expert and then with

**15**

explicit instruction as to how to proceed, the rebuilding work commenced on June 24, 2019.  This actual commencement (the dilapidated roof "tear off" commenced).  Not only was Defendant made aware of the rebuilding commencement when it began, but at each step along the way by virtue of photographs sent to Defendant whose same adusters/legal counsel were still handling the purported settlement.  See, Exhibit 3 which contains just a few of the photographs of the continuing construction and its progress. Never in that subsequent time of Summer 2019  did Ms. Timberlake,

Mr. Watts, nor any other Travelers representative ever state that Travelers had not or was not fully and timely advising them of this construction and/or did not know that it was occurring.  That lack of advisement continued into 2020 when Watts, who stayed on as the Defendant's assigned adjuster was often being sent invoices and photos of it..

20. Plaintiff Kenneth Turoczi had done substantial further work through Summer and Fall, 2019, in completing interior carpentry work.  In all this he had documented both his use of personal funds and labor to further completion of the structure's refurbishing.  Through Summer and into  the Fall 2019 ,Mr Turoczi  had sent both his own invoices and those of a hired contract labor to perform the work shown on the attached Exhibits(3) which are 7 separate documents, which show the "before" and after scope of the 2019 reconstruction ).   When Watts  finally did respond by text, he claimed he could not locate any of these invoices, even though each group had been either had delivered to his work office or sent by mail.

21. For this reason Plaintiffs had copied all previous invoices they had sent Watts the first time and again delivered them to Travelers office (a location Watts had told them they could use for this purpose).  Yet following this second delivery they received neither payment (partial or otherwise) from Watts nor any communication.  Plaintiffs made further attempts into 2020,  got intermittent  texts that gave no help except they should "contact Sara Timberlake."

22.  Having suffered  several bouts of COVID during late 2020 and into 2021 they had no communication with Defendants, although Plaintiff Tyrene had during this period attempted to do so.  Their eventual contact came through undersigned counsel who did contact Defendant's present counsel and present most of the time and business records that had occurred in his participation of the 2019 reconstruction work and were sent in his March, 16, 2022 letter to Ms. Potts

23.  Ms. Potts'  May 11, 2022 letter in response to counsel's earlier March 16, letter sent to her of Defendant's real reason(s) for discontinuing the 2022 reconstruction payments, , i.e., failure to give "timely" notice of election to rebuild the residence was not made, was first made known to these Plaintiffs.

## VI.  CAUSES OF ACTION AND CLAIM FOR RELIEF

A. Causes of Action for improper settlement:  There are two causes of action for improper settlement that both arise from the above referenced facts underlying this claim.  Both apply to the described acts or omission of Defendant, which are attributed to it by the proper scope of review as is stated in paragraph 10.  These common acts

violate both  the statutory and Oklahoma law governing insurance practice settlements (36 O.S. §§ 1250.1, et. Seq., the Oklahoma Unfair Claims Settlement Practices Act , "UCSPA" due to *numerous* violations of its specific provisions as to what constitutes and unfair settlement conduct in the insurance industry and is an action in tort when it injures the  person(s)  or their property as in this particular insurance settlement matter. It, also, invokes Title 15, Oklahoma Statutes, and in particular its' Section 211 (15 O.S. §211), which provides that contracts are unlawful which are "contrary to an express provision of law" or "contrary to the *policy* of express law though not expressly prohibited".  (Emphasis). Plaintiffs did then and do now contend that a violation of a law(s) whose clear purpose is to ensure fair play and substantial justice in regulating acts and omissions of insurers within the insurance industry is just such contract law which must not violate a provision of UCSPA .

Defendant's actions  violate  the basic underlying public policy of Oklahoma within UCSPA, which is to ensure fair and reasonable treatment of one who posses the great need of fundamental fairness offered by the two titles of Oklahoma Law, particularly when seeking fair settlement of their loss while the recipient insured is placed at great disparity with the person or entity who has an obligation to grant that further protection in a fair and expeditious manner.

B.  Cause(s) of Action for  failing  to afford resonable accommodation:

The unexplained conduct by Defendant to not give Plaintiff Tyrene Turoczi the reasonable accommodation of receiving and/or transmitting communication about her

claim by using text messaging and not by email, because of her need to receive such communication in a manner that would accommodate her severe vision loss, but also, because she could not even receive communication to the address Defendant insisted on using,   "punkphillyokc@gmail.com", constitutes a violation(s) of the 1990 Americans with Disabilities Act, Title III ("ADA").   And because of Defendant's refusal to extend the many requests for such accommodation by her these acts, also, constitute an unfair settlement practice in that Defendantt did not reasonably communicate with her as Required by Title 36 of the Oklahoma Statutes.

C.  Claim for Relief:    Plaintiff's claim for relief of contract insurance rights owed under the base policy and several additional coverages and endorsements thereon and not paid is the amount  of $413,498.00, plus any interest  and the costs of litigation.

Plaintiff Tyrene Turoczi further requests a declaratory judgment that Defendant's acts or omissions in not giving her a reasonable accommodation in its settlement practices herein with respect to her severe vision loss constitutes a violation of the ADA and that she be afforded any and all remedies afforded by it.

All of which is respectfully submitted.

Jury trial demanded.

_/s/  Gary W. Gardenhire____
Gary W. Gardenhire,  OB#3235
Attorney for Plaintiffs
1005 Fountain Gate Cir.
Norman, OK 73072
Tel.: 405-701-3398

**19**

## CERTIFICATE OF SERVICE

I hereby certify that on  (if leave is granted) a true and correct copy of the foregoing document was served upon the following via the Court's electronic system, electronic mail, and/or U.S. Mail, postage prepaid thereon to:

    Sara E. Potts
    Doerner, Saunders, Daniel, *et al*
    210 Park Avenue, Suite 1200
    Oklahoma City, OK73102

    -and-

    Michael S. Linscott
    Alexandra J. Gage
    Williams Center Tower II
    2West Second Street, Suite 700
    Tulsa, OK 73403-3177

    Exhibits:  Earlier transmission as explained, infra.


     /s/  Gary W. Gardenhire

**20**



Entry

EXHIBIT
1
page 1



EXHIBIT
1
Page 2



**TRAVELERS**

Asah Watts
General Adjuster
Personal Insurance
Property Major Case Unit
P.O. Box 430
Buffalo, NY 14202
405.431.7482 TEL
866.381.6247 FAX

February 8, 2019

Kenneth and Tyrene Turoczi
11701 Silvermoon Dr.
Oklahoma City, OK 73162-2224

and

Kenneth and Tyrene Turoczi
Southwest Cathedral
3440 S.W. 25th Street
Oklahoma City, OK 73108-5025

Dear Mr. and Mrs. Turoczi:

Travelers is continuing to work as quickly as possible to resolve your remaining claims as a result of the fire. However, attempts to communicate with you by text, phone and in person have not been as productive as they could be. Further, your preferred communication (text messaging) has not been helpful in continuing to move this claim forward.

You have mentioned on several occasions that you have retained legal counsel and we have asked on several occasions for the name of your counsel so we could correspond with that person. As I advised you by phone today and given the issues we are having between one another with respect to your personal property claims, we have retained Sarah Timberlake with Doerner, Saunders, Daniel & Anderson, L.L.P. to represent Travelers going forward on this claim. We believe it will be in the best interest of all to schedule a date and time for you and your counsel to meet with a representative of Travelers and Ms. Timberlake at your attorney's office or her office. During this meeting, we can address the current status of your claim including payments issued to date and hopefully reach an agreement on how to resolve the remaining claims under your policy. We would request that both you and your husband be present at this meeting and will certainly work with you and your attorney to arrange a mutually convenient time. Please have your attorney contact Ms. Timberlake at 405-898-8651.

You indicated in recent messages that you requested a copy of the certified policy but had not received one. My records show that I contacted you on or about January 8, 2019 advising a copy of the policy could be hand delivered to you at whatever location you wish. The policy was mailed to your home address on January 9, 2019 and I also delivered a copy to the church at the same place a $10,000 advance had been delivered. We subsequently learned Mr. Turoczi had

possession of the policy on or about January 9, 2019. We previously sent you a Proof of Loss and inventory sheets.

For your convenience, I am again sending a certified copy of the policy. I am also enclosing the most recent estimate of your loss which reflects any adjustments per the HO-420 Endorsement.

Sincerely,

Asah Watts
TRAVELERS COMMERCIAL INSURANCE COMPANY

4919564.1





EXHIBIT

TT'S 3
Amended Comp.

7 numbered doc.



EXHIBIT
TT's 3
Amended Comp
7 numbered doc



EXHIBIT 3 NO. 3



**EXHIBIT**

3 No.4

tabbies



EXHIBIT

3 No.5

tabbies



EXHIBIT

tabbies®

3 No.6