IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| (1) KENNETH TUROCZI and <br> (2) TYRENE TUROCZI, <br><br> Plaintiffs, <br><br> vs. <br><br> (1) TRAVELERS COMMERCIAL <br>     INSURANCE COMPANY, <br><br> Defendant. | ) <br> ) <br> ) <br> ) <br> ) <br> ) Case No. 5:23-CV-00095-JD <br> ) <br> ) <br> ) <br> ) <br> ) |

**PLAINTIFFS' REPLY TO DEFENDANT'S OBJECTION AND RESPONSE IN OPPOSITION TO PLAINTIFFS' SECOND MOTION FOR LEAVE TO FILE AMENDED COMPLAINT**

This reply is made to that response of Defendant on April 3, 2023 in objection and response in opposition to Plaintiffs' second motion for leave to file an amended complaint in the above matter (hereinafter "the response" or "defendant's response"). Plaintiffs will, also, refer to corporate Defendant as either that party or as "Travelers".

**I. REPLY TO DEFENDANT'S INTRODUCTION.**

For the most part, Defendant's Introduction accurately tracks the removal of this case and subsequent order of this Court with regard to Plaintiffs' request to be allowed to amend the original State petition which was drafted in a notice pleading format, allowed by Oklahoma civil procedure, but which has been increasingly disfavored in the fact pleading standards as articulated by Rule 11, Fed.R.Civ.P. It was the Court's advisement to Plaintiffs in its Order (Dkt. # 10) that caused a much more detailed fact allegation to be made in the proffered amended complaint. Much of these pleaded facts have neither been denied nor otherwise rebutted by Defendant's April 3, 2023 fact allegations in response. These allegations are again that various statutes of limitation

1

contained in Defendant's policy as well as in Oklahoma law relating to the violation of its duty of good faith and fair dealing in the settlement of insurance claims make the claim as pleaded barred by applicable statute(s) of limitation.  Defendant's response, which is in essence a renewed motion to dismiss the amended complaint, similarly, raises not only the argument that the facts of Plaintiffs' amended initial pleading (i.e., the proffered amended complaint) are time-barred by applicable statute(s) of limitation, but also, because the claims are factually unsupported  and Plaintiffs cannot "plausibly plead a claim upon which relief can be granted".  (Dkt. # 18, p. 3)

**II. ARGUMENT AND AUTHORITIES.**

**A. Standard of Review**.  The review standard in  *Swanson v. Bixler,* 750 F.2d 810 (10th Cir. 1984): all factual allegations are taken as true with "all reasonable inferences indulged in favor of plaintiffs" applies herein. *See also, Hospital Building Co. v. Trustees of Rex Hospital,* 425 U.S. 738, 96 S.Ct. 1848, 48 L.Ed.2d 338 (1976):

> "*W*hen a complaint and action are dismissed for failure to state a claim upon which relief can be granted, it must appear *beyond doubt* that the plaintiff can prove *no set  of facts* that would entitle him to relief."   (Emphasis added.)

Plaintiffs  in their amended complaint (Dkt. # 17-1, ¶10) raise a further standard: that any act, deed or transaction of an insuren includes those acts of any of its individual agents while actively engaged in the company's direction or control. n.1

**B. Statutes of Limitation Do Not Bar Plaintiffs' Causes of Action.**

*i.   Plaintiffs' Bad Faith Claim Is Not Statutorily Time Barred.*

Defendant begins this argument with an analysis of Oklahoma's two year statute of limitations for tort, including bad faith claims,  *citing,* 12 O.S. § 95(3)*.*  Dkt. #18, p.6.  It

---

1- This standard is important, because the acts or omissions complained of herein arose not from the printed word of the subject policy and its additional coverages, but from the acts or omissions of certain agents of Defendant in the application of that policy, which violate  various statutory provisions of Oklahoma law governing  conduct of insurance claim settlement, as well as that of federal disability law.

argues such statute begins to run when the cause of action "accrues", *citing, Stephens v. General Motors Corp.,* 1995 OK 114, 905 P.2d 797, 799, which accrual means when a litigant could have first maintain an action to successful conclusion.  Plaintiffs did early on, as stated above in page 6 of its' response, experience some inability to properly communicate due to several factors, including the loss of all their telecommunication service, less and except a "borrowed" work phone and Plaintiff Tyrene's vision impairment that necessitated text messaging which she could enlarge (with respect to received messages) and voice texting, which she could use to transmit messages.  The other communication difficulty occurred at the very inception of the settlement period when both adjusters Stokes and Monzingo experienced difficulty in contacting Plaintiffs.  See. Dkt. # 17-1, ¶¶ 4 & 5.  Plaintiff Tyrene told Ms.  Stokes, who was the first to have difficulty sending email to the address *"*[punkphillyokc@gmail.com](mailto:punkphillyokc@gmail.com)*"*:

> "That's great now but nobody *texted* me the info,  I  *told  them I*  **had no emai***l*  (the fire had destroyed it)."  (Emphasis added.)  *Id.,* ¶4.

The amended complaint notes the very same situation happened several days later with Mr. Monzingo, who had difficulty communicating via email to that same address:

> Plaintiff Turoczi:   "We only have his (Mr. Turoczi's) work phone and he has to clock in to check his telephone messages, so if  you could all text it would be great."
>
> Mr. Monzingo:  "OK, I'll let *them* (his manager Mr. Bogosh and other employee personnel involved) *know*."  (Emphasis added.)  *Id..* ¶5.

The significance of these discussions is that *each* adjuster had  in late December, 2018, been made known  of why they were  unable to communicate with Plaintiff, which was that she did *not have* an  email server that would receive messages to that address.  The server that contained that address was destroyed  and  if there was an alternate means to access it the password  to it was lost and  that there was still no way to access its' data.  Plaintiff gave these two adjusters the number of the work phone to use when they needed

to contact Plaintiffs by text and communication was then restored between the parties. Manzingo, then the principal adjuster contact, said he would advise all other adjusters involved of Plaintiff's need for texting. Inferentially, he did then so advise "all". See, n. 2

Defendant next indicates that the claims process "occurred" during 2019 and early 2020. That is correct. However, to the extent this was meant to be the parameter of the claims process, Plaintiffs dispute that. This is because Defendant, while it made certain references to, e.g., the "2019 claims period" and the like, never advised Plaintiffs exactly what that description meant and/or the exact period of time that was intended to define as to when its' "claims period" settlement process" *concluded*. Such conduct to unilaterally define the truth of the "settlement period" itself without ever so notifying its' insured is a violation of 36 O.S. §§ 1250.5(1), Unfair Claims Settlement Practices Act ("UCSPA"):

> "Any of the following acts by an insurer . . . constitutes an unfair claim settlement practice: (1) Failing to *fully* disclose to first-party claimants . . . provisions of any . . . insurance contract when the . . . provisions are pertinent to a claim . . .." (Emphasis added.)

This proviso was used on numerous occasions. However, it's exact meaning was again never disclosed to Plaintiffs, and in particular the date/time when the process ended. On at least one occasion when Mr. Watts was asked to explain what this "period" meant he failed, refused, or was otherwise unable to do so. In its' response Defendant uses several occasions when the settlement process might have begun (such as the sale of the home) in order to trigger a statute of limitation and others when it might have ended. At Dkt. # 18, p. 3, second full paragraph, Defendant notes the conclusion of the initial loss estimation process is alleged to be the end of "January 2020". That is a correct quote. However, in the context of the loss and subsequent surrender of the property to the Defendant to form an estimate of the loss, that was done in January, **2019.** The quoted

---

2- Another aspect of Mr. Manzingo's involvement is that he is the adjuster that initially advised the insured they did not have pet boarding coverage. While that caused some difficulty in Plaintiffs finding a habitat with animals allowed, when Mr. Asah Watts took over that position in early January, 2019 he did confirm that Plaintiffs did have such coverage. Defendant allowed pet boarding and indemnified Plaintiffs up to the policy's limits. Hence, this was and is not a part of their claim(s) against the company.

is in reference to mold growth that should have been known to Defendant's estimators from visual observation in their *original* inspection concluded in January "2019".  The quote it was concluded in "January, 2020",  than in January,  2019, was therefore  errata.

It is the Defendant's argument  immediately following that errata, which states the crux of this litigation.  That is, it's assertion that "at least by" the time Plaintiffs sold the property at a loss in June, 2020,  when forced to sell their house because of a lack of personal funds to continue rebuilding it,  they "admitted" they could have maintained an action against Traveler's.  *Id.* This was because they alleged Defendant had "reneged" on indemnification.  What was alleged is that Defendant had not *timely* indemnified them,  but not that it would *never* indemnify them.  This is important, because subsequent admissions by Travelers reveal the real reason it had *much earlie*r when reconstruction began on June 24, 2019 *already* decided not to further indemnify Plaintiffs, because of their failure to give the "required" notice of electing the reconstruction  of the  residence and  not  demolition  and  rebuilding.  *See,* Dkt. # 17-1 ¶23, quoting Sara Potts' letter of May 11, 2022.  This same letter also admits that *if* Plaintiffs had provided any of the required notices requested it "would have become apparent" to Travelers that Plaintiffs "did not intend" to pursue the demolition method.  *Id.*, Potts'  letter,  p. 6.  But it is *how* Defendant  pursued  settlement starting during mold remediation and Plaintiffs' actual notice of  its' existence to them  circa  April 12, 2019  forward  when Plaintiff  contacted Mr. Watts and for the third time as pled in the proffered Amended Petition (Dkt. # 17-1, ¶¶  15 & 17)   advised Defendant of mold existence,  that is critical  to Defendant's defense of failure by Plaintiffs to advise of the election to reconstruct.   These  settlement practices  also, invoke Defendant's  duty  not to "knowingly  misrepresent  to  claimants pertinent facts  . . . relating to coverages at issue." 36 O.S. §§1250.5 (2) and (3), which also provides it is an "unfair settlement claim practice" if an insurer fails to  "implement

5

reasonable standards for prompt investigations of claims . . ..." Mr. Watts failure to comply with §1250.5(2)(3) by causing no further investigation of the fact that there *did* exist disclosed proof of "spreading mold" as early as February, 2019, and that Plaintiffs had retained a structural engineer and a mold remediation expert to determine if the structure could be rebuilt. The mold experts opinion was received in early in June, 2019 and the report of the structural engineer later in the month. Both reports stated that it could be rebuilt if mold was completely remediated. These reports were made available to Travelers near the time reconstruction began in late June, 2019 by mail and a separate packet delivered to its' Oklahoma City headquarters for Ms. Timberlake. These report packets also contained a copy of an Oklahoma City building permit . *Id.* ¶¶ 17 & 19.

    Not only did both Travelers' principal building adjuster and his legal counsel overseer have actual notice of the inception of Plaintiffs' "election" to reconstruct the residence in June, 2019, approximately six months after the loss, they were kept apprised of its' continuation by a series of both photographs and text which explained what and how it was being reconstructed. *See,* Exhibits 3 No. 3 through 3 No. 6, attached to the proffered Amended Complaint, which showed the construction progressing through the month of July, 2023. This construction was done in part by Plaintiffs and their family, but it was also done by hired contractors whose statements were given to Mr. Watts at the times received and copied to Ms. Timberlake. Significantly, never at any time after subsequent delivery of these "proof of loss" statements from reconstruction, did Mr. Watts or Ms. Timberlake , given their knowledge by these *additional* productions of statements and pictures ever advise Plaintiffs that it had *already* determined claim denial, because their "election" not to demolish, but rather to rebuild the structure, had *not* been given to the company. *Id.,* ¶ 19. Deendant's notice failure violates OAC §365:15-3-7(a)'s affirmative duty that written denial be made within 45 days of any proof of loss.

    When Plaintiff Kenneth began to press Watts for payments, his excuse was not

any such lack ofdenial notification, but was that he could not find the receipts and needed them to turn in the proof of loss, but would try to locate them.   Dkt. # 17-1, ¶ 20. See, n. 3  For this reason Plaintiff Kenneth *again* made copies of all labor and material costs incurred and hand delivered them to Traveler's in late September, 2019.   Yet, even with this second delivery, Watts did not make any payment.   Dkt. # 17-1 ¶ 21.  Plaintiffs made several efforts to resolve payment up to and through February, 2020. There were vague responses in 2020 that gave neither further explanation nor help except Plaintiffs should "contact Sara Timberlake" *Id*.   While reconstruction efforts continued the development of the Covid epidemic during that same period made it extremely difficult to obtain both materials and labor to assist in the completion of the renovation.  This was primarily due to the impairment of the supply system of this country.   It was this impairment together with lack of indemnification from losses "already incurred and paid" that caused Plaintiffs to sell the home and "cut their losses".  It was **not** any actual notice Defendant had *already* decided to deny the claim. Such disclosure came much later by Sara Potts on May 11, 2022, as argued infra.

    ii.   *Plaintiffs' Breach of Contract  Claim Is Not Statutorily Time Barred.*

This reply is much more brief, because the very same acts involved in the tort of bad faith settlement relate to a violation of Oklahoma civil law, *ex contractu*.  The undisputed facts really demonstrate *when* knowledge of Defendant's bad faith settlement actually became known and, therefore, the described "accrual"  of a viable cause of action either in contract or tort did in reality accrue.  Stated differently, Defendant's 2019 decision to cease any further payment was *never* disclosed to Plaintiffs' until May 11, 2022, when  Ms. Potts put in writing  what had theretofore been kept secret by the Watts/

---

3-  In retrospect, adjuster Watts never attempted to explain in the "settlement period" why he could not just have obtained these "lost records"  from Travelers Oklahoma City headquarters office and/or Ms. Timberlake, to whom copies of these records had, *also* been, delivered.  It was at this time that Plaintiff Kenneth began to be concerned about payment, but continued to believe Watts' excuse that it was on account of his not being able to locate or obtain the submitted records of proof of loss.

Timberlake consortium; i,e., the refusal to pay for this reconstruction was not because Watts could not find proof of loss records, but because Plaintiffs had allegedly failed to notify Defendant of their election to reconstruct. It was also this counsel Potts who produced significant portions of the claims file, which had been requested in July, 2019, but not disclosed to Plaintiffs until May, 2022.  Counsel correctly noted in her May 11 letter (page 6) what could have occurred *if* "notice" of the election to reconstruct the existing structure,  rather than demolition, had been given. With  such notice Defendant through Potts admitted a readjusted claim "based upon the requirements and costs associated with reconstructing the damaged portions of the home"  could have been done.

In response, Plaintiffs states that this disclosue was exactly what undisputed evidence before the Court shows that Plaintiffs ***did*** do during the "settlement period": give ***very*** timely notice  *both* of the existence of mold  and election to reconstruct the damaged structure [see, Dkt. # 17-1, Part V(B) Factual allegations: "Mold Remediation Period", ¶¶ 14-18 and Part VC "Reconstruction Election and Rebuild Period", ¶¶ 19-21] It was not until May 11, 2022 that Plaintiffs first learned the *real* basis upon which their construction losses had not been paid and that this was in fact its' "final" decision which they had, also, not been made aware of.  In its Order (Dkt. # 10) the Court advised that Plaintiffs attempt should be presented upon a more factual oriented basis to establish their claims.  They have attempted to do so.  Substantial evidence is that it was  Travelers that did *not* give notices it was required to timely give: the real basis for its' settlement conduct, i.e., alleged lack of notice of Plaintiffs' election not to demolish and rebuild, until done by  present counsel's May 11, 2002  letter.  It was only then Plaintiffs knew they had a claim they could prevail upon, because the basis that (1) they hadn't given notice of  mold presence and (2) hadn't given notice of their election to reconstruct were both false in that they had in fact given such "required" notice, not only once, but for both  by delivery of documents  beginning  a month *before*  Timberlake's July 22, 2019

letter that this reconstruction election, rather than demolition *had been* made. The falsity of these facts, which is required to be taken as true in the applicable review standard(s), but are also wholly uncontroverted at this date, proves Defendant's conduct to be wrongful and accrued. Any statutory limitation must be calculated from May 11, 2023.

**C. The above evidence does establish a bad faith breach of contract claim.**

While the UCSPA may not in and of itself provide a "remedy", settled Oklahoma law is that a violation of its standards *may be* considered in deciding whether an insurer's particular conduct is unreasonable and sufficient to constitute a basis for bad faith. It may provide the District Court guidance in making this determination. *Beers v. Hillory,* 210 OK CIV APP 99, 241 P.3d 285. The Oklahoma authority relied upon by Defendant, *Addudell Lincoln Plaza Hotel v. Certain Underwriters of Lloyd's of London,* 215 OK CIV APP 34, 348 P.3d 216, notes that at ¶¶ 26 and 27 of the opinion the OSCPA :

> ". . . may provide guidance to a trial court in determining whether to grant summary judgment, but it does not function as an appropriate guide for a jury to determine bad faith. . . . (¶ 27) The trial court should have given OUJI No. 22.1 ( which states simply that) 'An insurance company has a duty to deal fairly and act in good faith with its insureds'. "

Accordingly, none of Oklahoma's recent case authority stands for the proposition that, as here in a motion of disposition, the Act may *not* provide the Court guidance in determining violations of its provisions sufficient to form the basis of bad faith. Going forward to determine if bad faith basis "exists" is not a remedy nor a private action right.

**D. Evidence does establish violation of the Americans With Disabilities Act ("ADA").**

Title III of the ADA does apply to business services and in particular, as relevant here, to businesses that rely upon electronic communication in provision of their service. *See,* 2 U.S.C. § 12182(a) that sets forth actions prohibited by the Act, including the so-called "reasonable modification" standard, which means modifying practices or processes in delivery of services to disabled persons, one of which disability is loss of or diminished vision *Robles v. Domino Pizza, LLC,* 913 F.3d 898 (9th Cir. 2019), *cert. denied 10/7/2019.*

9

Since *Robles,* persons with loss of or diminished vision have received definitive rights as having a physical impairment that "limits a major life activity". In a 10/7/2021 guidance document entitled the ADA's "*List of Disabilities*" five examples are given of what constitutes such impairment. Three were "seeing", reading and communicating", all of which were vital to Plaintiff in participating electronically in this settlement process. A second DOJ paper: "*Communicating Effectively with People with Disabilitie*s" begins:

> "Communicating successfully is *essential* to providing services . . . *or* doing business" and continues with examples of "Aids" to help: "Large print materials, *Accessible e*lectronic and information technology" etc. (Emphasis added.)

These "guidance documents" are at USDOJ Civil Rights Division's website by name. The *only* modification Plaintiff requested was that in electronic communication Defendant use text messaging for the reason it better served her blurred vision, which was many times ignored. *See,* Watts' 2/8/2019 letter, Dkt. # 17-1 Ex 2: ". . . "your preferred communication" text "has not been helpful in continuing to move the claim forward." Watts was advised in January, 2019, of Plaintiff's worsening loss of vision. Thereafter, he many times made delayed responses to texts or simply did not answer, e.g. those notifying Defendant of worsening mold in early 2019, Dkt. # 17-1, ¶ 15. The simple request to use text was often not extended violating ADA's "reasonable modification" standard, *supra.* Plaintiffs would clarify this claim is made *only* for declaratory relief, not money damages

## Conclusion

Plaintiffs request that by virtue of evidence presented in the amended complaint and of legal precedent in this reply, Defendant's motion be denied. Respectfully submitted.

>                           /s/  Gary W. Gardenhire_____
>                           Gary W. Gardenhire, OBA No. 3235
>                           Attorney for Plaintiffs
>                           1005 Fountain Gate Cir.
>                           Norman, OK 73072
>                           Tel.: 405-701-3398
>                           E-mail: *ggardenhire7@gmail.com*

## CERTIFICATE OF SERVICE

I hereby certify that on this 14th day of April, 2023, a true and correct copy of the above and foregoing Reply document was served upon the following persons via the Court's electronic mail filing system (ECF) to:

> Sara E. Potts
> Doerner, Saunders, Daniel, *et al*
> 210 Park Avenue, Suite 1200
> Oklahoma City, OK 73102
>
> -and-
>
> Michael S. Linscott
> Alexandra J. Gage
> Williams Center Tower II
> 2West Second Street, Suite 700
> Tulsa, OK 73403-3177
>
>   /s/ Gary W. Gardenhire