# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| (1) KENNETH TUROCZI and<br>(2) TYRENE TUROCZI,<br><br>     Plaintiffs,<br><br>vs.<br><br>(1) TRAVELERS COMMERCIAL<br>INSURANCE COMPANY,<br><br>     Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)    Case No.  5:23-CV-00095-JD<br>)<br>)<br>)<br>)<br>)<br>) |

## **PLAINTIFFS' AMENDED COMPLAINT**

Gary W. Gardenhire OBA 3235
1005 Fountain Gate Circle
Norman, OK 73072

Tel.:      405-701-3398
Mobile:  405-574-0906
E-mail:    ggardenhire7@gmail.com

Attorney for Plaintiffs,
Kenneth and Tyrene Turoczi

## TABLE OF CONTENTS

Page

**I. INTRODUCTION** …………………………………………………**1**

**II. NATURE OF THE ACTION**………………………………………...**2**

**III. PARTIES**……………………………………………..……**9**

   A. Plaintiffs………………………………………………… **9**

   B. Defendant………………………………………….……… ..**10**

**IV. JURISDICTION AND VENUE**……………………………………... **10**

**V. FACTUAL ALLEGATIONS**…………………………………**12**

   A. Claim Initiation  and Estimation Period: DECEMBER 23, 2018 -*……….**12**

   B. Mold Remediation  Period:  MAY 20, 2019 - ** …………...…….……...**13**

   C. Reconstruction Election and Rebuild of Residence Period:
      JUNE 24, 2019 – JUNE 18, 2022 ***…..………………….……………**16**

**VI. CAUSES OF ACTION AND CLAIM FOR RELIEF** ………………………**19**

**EXHIBITS:**

   Ex. 1  page 1:  Residence Interior from main entry showing extent of debris.
           page 2:  Stairway to second floor; front entry is to it's right.
   Ex. 2:             February 8, 2019 Watts' letter regarding use of texting.
   Ex. 3  page 1:  Residence Exterior-rear of home where fire originated.
           page 2:  Same as p. 1 from different angle showing upper floor.
           page 3:  Initial delivery of material & construction circa July 1, 2019.
           page 4:  Continued reconstruction of home *circa* 2d week in July.
           page 5:  Same, but one week later.  Cf., pages 1 & 2, above; note:
                    all the above pictures were *before* Timberlake's 7/22/2019 letter.
           page 6:  Further work done after date of the above letter.

   Ex. 4             As explained in the body of argument, *infra.*

**NOTES Relative to Explanation of Table of Contents "Periods", above:**

\*  This ending period is not able to be determined, inasmuch as there was no finality in some areas such as, e.g.,  with respect to the mold claim  which  was  made, but  the defendant apparently  believed that timely notice had not been given that there *was* a mold condition which existed.  This is yet another "lack of notice" rationale to non-payment of its duty to make indemnification even though  it had been given access to the entire structure for the entire month of January, 2019  during which time mold was visible, and  further given written notice  given on February 5, 2019 to Asah Watts  that it appeared  to be growing and should have been included in the estimate and further given yet again in early April, 2019 when it was given a second written  notification that Plaintiff Kenneth "needed to talk to someone about the mold" and asked  which adjuster was going to handle it?  Defendant never responded to that request, but used its' "lack of notice" as a defense to paying monies under Plaintiffs'  mold coverage .

\*\*  Same as "\*" above.  For the stated reply to his inquiry that the mold would be resolved by "the demolition of the home" that was never further answered and given no such resolution of the demolition issue had been made.  The attendant notice given Defendant at that time period was that Plaintiff had hired a mold inspector to do an inspection in order to determine if the mold could be controlled and to report if it could be repaired what should be done to control/eradicate that condition.  This is "also" further evidence that no demolition "plan" ever been made or existed at the time of Mr. Watts statement in this settlement process.  Defendant also knew in June, 2019, because Plaintiffs would not make such election (for demolition) given the report subsequently furnished to Defendant on June 25, 2019 saying it *could be* repaired)  and given Plaintiffs'  established intent to then reconstruct, which Plaintiffs  did in fact begin on or about June 24, 2019 with their roof "tear off".

\*\*\*  This reconstruction of the damaged residence began on the above date (6/24/2019) and ended when Plaintiffs were forced to sell the structure at a loss, because they had exhausted any available liquidity given Defendant had renegged  on indemnification  for labor and material to do  construction that they *had* paid for using their own funds.  As Plaintiffs explained in their reply to Defendant's response/ objection DOC #22, p. 5,  this did not mean that they were ever notified that Defendant would *never* make such indemnification, but rather, was not doing so timely and used such excuses as "lost" proof of loss documents to advance the claim (which Plaintiffs subsequently provided replacement) as the reason why indemnification was not being made. Plaintiffs continued to believe Defendant would subsequently indemnify them. It was only in May 11, 2022, that the real reason for this delay was made known to them.

-ii-

COME NOW Plaintiffs Kenneth Turoczi and Tyrene Turoczi ("Plaintiffs" or "Plaintiff Kenneth" or "Plaintiff Tyrene", respectively when reference is made to a single party) and for their Complaint and cause(s) of action against Defendant Travelers Commercial Insurance Company (hereafter, "Travelers" or Defendant) do allege upon their information or where stated to be upon their belief,  and state upon their oaths to this Honorable Court as follows:

## I. INTRODUCTION

1. As has heretofore been stated by Defendant in its' earlier dismissal motions, this matter does arise from a policy of insurance issued by Defendant to protect Plaintiffs from casualty losses, which included that caused by fire. The policy included a basic homeowner's policy for the indemnification of that loss, but also, certain additional coverage and endorsements that had been purchased in addition to the basic homeowner's coverage.  The policy at issue herein has already been placed before the Court by Defendant as its' dismissal motion's  "Exhibit 1" and that document will be referenced in both statement of fact and argument of this amended complaint as "the Defendant's policy" or "the policy".   The policy at its page numbered "2" states the property coverage(s)  and the attendant limits of indemnification liability for each category of coverage it had calculated with regard to the loss at issue.

2.  This loss occurred on December 22, 2018  in a fire in Plaintiffs' residence located at 11701 Silvermoon Drive, Oklahoma City, OK (which Plaintiffs will hereinafter refer to as the "residence"), which started in its' den area located at the back

1

of the structure. The fire, after igniting' quickly spread and became a "Five Alarm" blaze, which in accepted firefighting parlance means "a fire that is so large and intense that it requires the presence of many firefighting units to try to contain it". *See*, Idioms, The Free Dictionary. That idiom was correctly applied here in that at Plaintiffs' residence fire there were at least four heavy "ladder" pumping units and for some time a fifth unit; and it took over two hours into the evening to quell the blaze. The firefighters had left by around 8:30 p.m., but when it had started up much later in the evening as reported by a neighbor, one unit had to return to quell the "start up" blaze at the site by pumping even more water into the piles of debris. The significance herein of the loss description is the sheer enormity of ash, water and other debris that was left behind and ultimately had to be removed and the area completely cleaned as a part of the "loss remediation process" and which process Plaintiffs were required to begin almost immediately, even before Defendant's inspection  for loss estimation purposes had concluded at the end of January, 2019. See,  Exhibit 1:  Interior debris *circa* December 26, 2018 (interior and staircase area debris of the residence).

## II.  NATURE OF THE ACTION

3.   Following the quelling of the fire that evening, Plaintiffs and their family were forced to seek shelter from a cold winter night with temperatures near freezing. Given that they had their surviving animals with them, they went to the shelter that had been founded by Ms. Turozi's grandparents and relatives.  The church shelter located at 3440 S.W.. 25th Street, Oklahoma City,  hereinafter the "Southwest Cathedral", did not

at that time have heating or water available, but did afford some protection from the elements.  The next day Plaintiffs attempted to contact Travelers to report the loss and get the claims process started in order to obtain all available assistance.  Their only means of communication was a single mobile celluar telephone, which Mr. Turoczi had obtained from his employer, Mondelez International, a food company for which he was a class A delivery truck driver, the device normally to be used when Mr. Turoczi was traveling for the company. The rest of their communication,  three other personal mobile  phones and  three personally owned computers had all been totally destroyed.

4.  Besides their extremely limited communication problems' Plaintiffs situation was made desperate, because on December 23, 2018, they actually had only the "clothes on their backs"  and most of these, such as a pair of house shoes, one set of sweat clothes and a blanket (this was their only shared "coat") had been given to them by their neighbor.  None of the children, except Milanni the youngest grandchild, even had shoes. The rest had only socks, but they too were all wet. Ms.Turoczi used Mr. Turoczi's work phone and contacted Travelers, whose number had been stored on that phone in an earlier contact with Defendant. It was around midday when the Travelers claims personnel answered.  Ms. Turoczi told that person she needed to submit a fire loss claim and the representative took her information, including the number of this only remaining mobile phone device.   Travelers also advised that a representative would soon contact them, but  only  "after Christmas".    Travelers representatives did, however,  come to the residence on the day before Christmas Eve when Plaintiffs  were

3

trying to secure the property and salvage any belongings or documents. Travelers delivered to them an emergency assistance check, some of which was used for personal needs, but most of which was used to help secure the property, such as covering broken windows. The several representatives that came also left some paperwork for Plaintiffs to begin listing personal property ruined or lost in the fire. On December 26, 2018, Plaintiffs contacted Tracey Stokes,  whose contact number had been given, because she would be the adjuster performing contents adjustment  (i.e., the papers Plaintiffs had been left at Traveler's initial personnel visit).  Importantly, in their subsequent discussion the matter of Plaintiff's limited communication ability was discussed.   The context was that Ms. Stoke's had brought up the subject of the temporary hotel arrangements that Travelers had set up. These arrangements had occurred on Christmas Eve, but the hotel was  unable to  contact  her (Ms. Turoczi) to confirm the reservation, because it was apparently sending that information by email, which had not been answered.   At that point Plaintiff  Tyrene stated to Ms. Stokes:

> "That's great now but nobody *texted* me the info,  I  *told   them* (Travelers) *I  had no email*  (because the fire had destroyed it)  .  . .."
> (Emphasis added.)

5. The same issue arose again only five days later on December 31, 2018, when Plaintiff  Tyrene contacted adjuster Codey Monzingo, whose name and contact number had been provided by Ms. Stokes.  Mr. Monzingo was the adjuster who was then going to be the overall property adjuster,  i.e.,  designated as her  "main point of contact".  In that conversation the same issue as had been discussed with Ms. Stokes of any *capable*

methods of communication with the Plaintiffs arose.  It was a lengthy discussion, done by text messaging, about various issues of claim settlement; however, it included the Plaintiff asking Mr. Monzingo for a certified copy of her policy (which had been destroyed in the fire) and an ALE check for housing other than where they were currently staying.  Monzingo replied in a lengthy discussion that he would contact yet another person involved in her claims process by the name of one  "Shane Friddle", who would  thereafter be"involved" in her claim by overseeing the payment of  checks that had been issued in partial payment, e.g., of additional living expense ("ALE").  Plaintiff explicitly advised these additional adjusters that her **only** means of electronic contact was this single celluar phone and she preferred text messaging, which preserved a visual record of any communication without accessing Mr. Turoczi's company's computer system.   The point is that the text method of messaging Plaintiffs was *repeatedly* requested, because it would allow the same thing that a workable email would accomplish without involving/interrupting the company's computer system which, *also*, kept track of work hours.  Plaintiffs did not then possess  a separate, workable electronic device with a program that would receive a personal email message, such as *punkphillyokc@gmail.com,* because all those had been destroyed in the fire and the sole celluar phone in use had a different email work address, that of the Mr. Turoczi's employer.  Ms. Turoczi explained in a text message from that phone:

> "We only have his (Mr. Turoczi's) work phone and he has to "clock in" to check his telephone messages so if  you could  all text it would be great."

Mr. Monzingo:  "OK, I'll *let them* (his manager Mr. Bogosh and other employee personnel involved) *know*."   (Emphasis added.)

6.  The third time that Plaintiff's need to be communicated with via text messaging and not email was also made known at this early stage  to yet another assigned adjuster of defendant and was still within the first 30 days of the fire loss. This was when Mr. Asah Watts ("Watts") took over Mr. Monzigo's duties and met with Plaintiffs in January, 2019, the first time at the burned residence and the second, approximately two weeks later when he picked up some receipts (ALE receipts) at the travel trailer next to the Church where they were staying. In one of these in-person discussions with this new adjuster at which the settlement to date was discussed, Plaintiffs' desire to be notified by text and *not* email was brought up.  As they had done with the first adjusters, Plaintiffs also explained to Watts the reason such communication method was necessary.   Plaintiffs advised Watts that after hearing the reason for using text messaging communication, both these earlier adjusters had complied with the request and Plaintiffs were in actuality able to receive necessary communications "immediately".  Mr. Watts said he too would comply, but that he, "didn't like to use texts" to communicate.  He continued to state this dislike in regard to subsequent issues involving texting and in a February 8, 2019 letter (Exhibit 2) advised that Defendant had "continued to work as quickly as possible to resolve your" claims; but added: " . . . (f)urther, your preferred communication (text messaging) has *not been helpful* in continuing  to  move this claim forward." (Emphasis added.)  Watts did not give  any

6

specifics as to why texting was "*not* helpful" in the premises.  He, also, did not address how texting had in this very settlement process  actually  been very  helpful:  by explaining to earlier settlement adjusters *why* the email address that initially was being used by defendants agents in this matter: *punkphillyokc@gmail.com*  was *not capable or adequate* to use to communicate, because it was on a computer that had been totally destroyed in the fire and incapable of receiving messages after that loss date.  This helpfulness was explaining to each of three separate Traveler's adjusters on different occasions why an email address  that had been provided  to Travelers long before the loss at issue could not after that loss be used to receive messages transmitted to it.  This lack of communication capability began the day of the holocaust fire that completely destroyed the residence.  This inability to communicate was not only because of the fire destroying its' content, but also, because of the fact that the password to retrieve any data that *arguendo*  still  existed and could be retrieved  was stored only on that computer and could still  not  be  accessed because it was not available to open the system. n. 1

    **7.**  But as the settlement process continued Watts, also,  inexplicably continued to request that he be allowed to send information via e-mail to that same address even <u>after he had actual knowledge it could not be accessed by the recipient and even if the</u>

---

n. **1 -**  The Plaintiffs had given this address to Travelers years earlier,  when they had their first homeowner's policy with the company.   They left Travelers insurance  for approximately two years *circa*  2015-2017.  In late year 2017 they returned to Travelers and resumed their homeowner's coverage with the company. At that time they again  began to use the  "punkphillyokc" address, which was used with Travelers  *for the company's direct billing to that address*.  It was used  for Travelers only for this purpose or on rare occasion to send Travelers information that it needed or had requested.

unit itself was *arguendo* capable of receiving it, the password to access it was, also, lost in the fire.   An example of this continued frivolous request was when Watts made it to Plaintiffs with respect to their previous request  (of June 25, 2019) that they be given a complete copy of their claims file. Watts wanted to send the claim file to that same email address "we have listed for you", which he had previously been advised on numerous occasions for the previous six months was incapable to store and/or allow access to an email sent to it. *See*, Exhibit 4: all texts of June 24, 2019 through July 9, 2019).  Plaintiff questioned about why their earlier request for a copy of their claim file had not been sent even with their direction of where it should be sent, (Ex. 4, *id.*).  The file was *never* sent to them during the "settlement period".  Ms. Turoczi, after the July 9 message's direction to Watts did attempt to contact him to be given an explanation why, after all their previous explanations of why *not* to use this email address, he continued to  attempt  to send  such information by email and not text or at least use certified mail as they had requested.  Stated differently, if Defendant  really desired its' insured  to be given knowledge of a communication from it, but allowed such conduct (ignoring Plaintiffs' request to be texted) to occur in the first place let alone allowing it to continue many times, could that be deemed to be fair treatment?   Watts never responded to Ms. Turoczi's telephone calls about her claims file.  Nor did Watts return any calls throughout the rest of July and into August, 2019, concerning  both Plaintiffs' claim file and his continuing frivolous efforts to  send important  information to the undeliverable *"punkphillyokc"* address that he well knew was unworkable.

8

8.  This "nature of the action" explains the development of the actual  settlement process, which was employed by Defendant  and used  throughout its' stated "settlement period" by its adjusters and legal agent(s)  employing that process.  Many such acts and/or omissions which occurred in that application  facially violate both the plain reading of Titles 15 and 36 of Oklahoma statutory law, which declares such conduct by any insurer doing business within this State to be in violation of statutory Oklahoma law provisions as well as the public policy underlying that law's adoption. Additional factual references not made here or in the Introduction  will be made in the Factual Allegations category of this Complaint.

## III. PARTIES.

### A.  <u>Plaintiffs.</u>

8.  Plaintiffs Kenneth and Tyrene Turoczi are married together as husband and wife and at all times herein resided in Oklahoma City, Oklahoma County, State of Oklahoma, wherein they jointly owned a residence located at 11701 Silvermoon Drive, Oklahoma City, OK.   All acts or omissions by Defendant herein concerning its' insurance coverage of their loss(es) vis a vis this residence's property damage occurred within Oklahoma or  Cleveland Counties and  within this Court's jurisdiction.  After the fire loss,  the Plaintiffs  and  their  family  in 2020 moved  to a  rural property  they had purchased in southern  Oklahoma City following the fire and during the attempted reconstruction of the Silvermoon residence's habitability.  In 2018 Plaintiffs  purchased a homeowners policy making its' application to be within the Court's jurisdiction.

**B. Defendant.**

9.    Defendant,    Travelers Commercial Insurance Company, is a foreign insurance company, now known to be formed and having its business in the State of Connecticut.  As Plaintiffs stated in the removed Petition it has at all times herein been licensed to practice in this State and has practiced as a purveyor of homeowner's property and casualty insurance coverage within the jurisdiction of this Court.   It provided for real and valuable consideration given by Plaintiffs the security of indemnity for losses provided in the policy identified in  ¶1,  above.

10.   As to scope of review, whenever reference is made to any act, deed, or transaction of the defendant insurance corporation, this allegation means that it includes any personal act, deed, or transaction done by or through any of its officers, directors, agents, employees, or representatives while they were actively engaged in the management, *direction* or *control* of the corporate entity's business affairs.

**IV. JURISDICTION AND VENUE.**

11.  This matter comes before the Court based upon Defendant's Removal under the provisions of  28 U.S.C. §§ 1441 and 1446.  As stated above,  Defendant was licensed  to practice within this State, but Plaintiffs also agree and concede that this alone does not defeat federal jurisdiction based upon complete diversity.   They similarly agree, as stated above, that based  upon uncontroverted fact the acts of Defendant were conducted primarily within this Federal Judicial District and, therefore, jurisdiction and  venue of this Court is proper.

10

12.  It is in conjunction with the original notice of removal and in the attendant motion to dismiss the removed State action, Defendant has argued that Plaintiffs had alleged but a single cause of action:  that of the breach of the affirmative duty of good faith and fair dealing.  That was and is inaccurate.  What the Petition was attempting to allege was a violation of *both* the statutory Oklahoma law governing insurance practice: 36 O.S. §§ 1250.1, et. Seq. , the Oklahoma Unfair Claims Settlement Practices Act ("UCSPA" or "the Act) *and* Title 15, Oklahoma Statutes, due to numerous violations of specific provisions of the Act and, hence as to what constitutes unfair and, thus, unlawful conduct in the insurance industry.  Such violations are also governed by 15 O.S. §211, which provides that contracts are unlawful which are administered "contrary to an express *provision* of law" *or* "contrary to the *policy* of express law though not expressly prohibited".  (Emphasis added).  Plaintiffs  contend that a violation of the Act, whose clear purpose is to ensure fair settlement practices and dealing in good faith within the insurance industry, is just such a contract as the Defendant's policy. It is the ***application*** of the policy which makes it contrary to both the Act *and* the public policy underlying it and, hence, an action *ex contractu* as well as one *ex delicto.* Because the Court has allowed the law of contract to be explicitly pleaded that issue does not need to be addressed at this initial stage of the pleading/pre-trial process.  *Cf., Beers v. Hillory,* 210 OK CIV APP 99, 241 P.3d 285, *with* the authority cited by Defendant, *Addudell  Lincoln Plaza Hotel v. Certain Underwriters of Lloyd's of London,* 215  OK CIV APP  34,  348 P.3d 216,  which notes its opinion:

the  "UCSPA .  .  . *may provide guidance to a trial court* in  .  .  .
summary judgment, but it does not function as an appropriate guide
for a jury to determine bad faith." (Emphasis added.) *Id.,* at ¶ 26.

The crucible of such pre-trial inquiry by this Court is whether the insurer acted

reasonably concerning a legitimate dispute over coverage at this stage of proof as

a matter of law , *Beers, id.*, or whether there exist disputes in evidence that make

it a question for the jury and not based upon what Defendant labels "undisputed"

evidence.  What  *Addudell  Lincoln Plaza Hotel* means is that even if at this stage

of the pre-trial process the Court does have inherent authority as the *Beers* Court

did to determine if as a matter of law the insurer acted reasonably in all its' acts

in this claim settlement process but where evidence is contradictory is it then a

question  for the jury to answer?

**V.  FACTUAL ALLEGATIONS.**

**A**.  Claim Initiation  and Estimation Period: DECEMBER 23, 2018 - >.

13.   These facts are mostly covered in the Nature of the Action paragraphs,

above, but will be   addressed further if needed   in the respective cause of action

involved.  A fact not specifically included in the Nature of Action paragraphs was an

explicit description of a fact that was also discussed in person with adjuster Watts

relating to the need to be able to communicate with the insurer's agents.  Besides not

having a  working personal e-mail, Plaintiff Tyrene suffered from a medical condition

of  increasingly severe  vision loss requiring  reasonable modification  by Defendant to

contact her by text rather than  e-mail, a method requested from the  claim's initiation.

**B**. Mold Remediation Period: MARCH – JUNE 24, 2019.

14.   While Defendant cannot with any credibility claim it *never* received *any* notice of a mold problem during the "2019 settlement period" vis a vis a mold condition  and especially not that of  a growing or "spreading" mold at the site during that time, it seems to argue in support of the failure to be *reasonably and timely* notified by Plaintiffs of that condition and owes no indemnification whatsoever  in those premises.  Rather, Defendant argues the cost to remediate the mold was somehow owed *only by* Plaintiffs who with their time, effort and personal funds had already caused *all* remediation to occur.  But the undisputed fact in this matter is that Plaintiffs with their very limited funds did  alone address and finally solve the problem in order to then be able to start the reconstruction of the site.  See, that transition of mold "repair" to residence repair at the following "Period", *infra.*

15.   With respect to the timely notification of mold this period immediately followed the Defendant's on-site estimation of the residence lasting most of the Month of January, 2019 in which it had exclusive "control" of the site and could directly observe the inception of the mold growth, which by February and certainly March, 2019 was steadily growing worse.  The first formal "notification" of mold was by Plaintiff Tyrene to Watts on February 5, 2019,  i.e., *immediately* after the Defendant's inspection  control  ended)  when she advised him to  include that mold condition in his overall estimate of the dwelling loss, *because* it was necessary to "cure" the mold in order to put the residence back to it pre-fire condition.  Watts *never* responded to any

such advisement to him.  A subsequent conversation about various settlement concerns, including mold, was February 18, 2019, when Watts advised Plaintiff Tyrene that she should "contact Ms. Timberlake to address your questions and concerns."   Yet even another attempt to contact Travelers (since there had been no response) was on April 12, 2019 when Mr. Turoczi contacted the adjuster and asked what Defendant was going to do to address the mold – and if  he would be the adjuster?  Watts' *only* reply was vague when he stated that "the mold would be gone with the *demolition."*  This was confusing, because neither Plaintiff had agreed to any "demolition" at that time. But even when Defendant had actual knowledge of it,  mold  was never further addressed.

16.  So, too, is Defendant's separate claim false that Plaintiffs failed to address *any* of the condition by their *own remediation* or control of the condition, which they were "obligated" to do under the contract.  This, too, is a falsehood, because it again was *only* the Plaintiffs who in fact did *any* remediation.  Certainly after Watts above statement they realized Travelers, without any explanation, was simply not going to do anything about mold.  What happened after that time was that Plaintiffs, their children and certain hired contract laborers did all the remediation!  Plaintiffs completed mold debris removal working many hours hauling it by hand in wheelbarrows to dump into rented dumpsters.  This amounted to dozens of such containers.  While Defendant paid for five of these containers under "debris" removal,  it made no more  indemnification  under mold endorsement protection, for  reason of  "lack of mold notification".

14

17.   Plaintiffs, in turn, in order to stop the spread of mold hired a mold remediation company, which advised both them and their separately retained structural engineer as to how to deal with the problem of mold in the reconstruction of of the residence.  It was his report, along with the separate report of the engineer, which concluded the structure could be repaired. *Both* these professional expert opinions were made available to Watts and, also, Sara Timberlake, at the time reconstruction work was undertaken.  The simple "notice" at that time of both the retained  experts' advice that rebuilding was possible should be deemed to have "triggered" their election to pursue reconstruction of their home and not demolition as they had earlier advised Watts would be the case if it could be reconstructed.  It did become "actual notice" when in conjunction with these reports Plaintiffs sent notice of not only the reports, but also, of a building permit  secured from  the Oklahoma City Development Services. These "notices" were also sent to Sara Timberlake, according to Watts' earlier direction that any such communication be made to her,  by hand delivery of a "packet" containing these documents to her attention at Travelers' Oklahoma City Headquarters.

18.   For all the mold "remediation" required by – but not reimbursed by – Travelers Insurance, the Plaintiffs "paid" with both their own funds or own personal labor various vendors and amounts:  to include:  approximately  $15,000 for dumpster rental;  $72,540 for debris removal,  contract laborers  in a  specific  amount to be  determined and $600 for mold inspection report  and other related payments for which  they were never indemnified by Defendant.

**C.** Reconstruction Election and Rebuild of Residence Period:
   <u>JUNE 24, 2019 – JUNE , 2020.</u>

19.   This period began and coincided with the end of the "mold" remediation period, above.   As shown by both these reports, complete mold removal was a necessary predicate to have happen, because without that condition precedent being fulfilled, the remaining wooden structures that had been "saturated" with the fungi would persist and probably grow.   This would greatly lessen a rebuilt home's commercial value as well as being a predictable and always-present health hazard.   At the immediate end of the structural engineer's analysis coupled with that of the mold expert and then with explicit instruction as to how to proceed, the rebuilding work commenced on June 24, 2019.   This actual commencement (the dilapidated roof "tear off") began reconstruction.   Not only was Defendant made aware of the rebuilding commencement when it began, but was kept fully apprised at each step along the way by virtue of photographs sent to Defendant whose same adusters/legal counsel were still handling the purported settlement.   See, Exhibit 3 which contains just a few of the photographs of the continuing construction and its progress.   Never in that subsequent time of Summer, 2019  did Ms. Timberlake, Mr. Watts, nor any other agent ever state that the company was not  being  fully and timely advised of this construction or did not  know  that  it was occurring.   That  lack of such advisement continued  into  2020 when Watts, who remained as the assigned adjuster, was often  provided  photos of the  ongoing reconstruction efforts and  invoices of subcontracted workers.

16

20.  Plaintiff Kenneth Turoczi had done substantial further work through Summer and Fall, 2019, in completing interior carpentry work.  In all this he had documented both his use of personal funds and labor to further completion of the structure's refurbishing.  Through Summer and into the Fall 2019, Mr Turoczi  had sent both his own invoices and those of hired contract labor to perform the work shown on the attached Exhibits (3), which are six separate documents showing the "before" and after scope of the 2019 reconstruction .   When Watts  finally did respond by text, he claimed he could not locate any of these invoices, even though each group had either been hand delivered to his work office or sent by mail.

21. For this reason Plaintiffs copied all previous invoices they had sent Watts the original time(s) and had hand delivered them to Travelers' office (a location Watts had told them they could use for this purpose).  Yet following this second delivery Plaintiffs received neither payment (partial or otherwise) from Watts nor any communication whatsoever.  Plaintiffs made further attempts into 2020,  but had gotten only intermittent  texts that gave no help except to "contact Sara Timberlake."

22.  Having suffered  several bouts of COVID during late 2020 and into 2021 Plaintiffs had no communication with Defendants, although they had  attempted to do so.  Their eventual contact came through  undersigned counsel who did contact Defendant's present counsel and present most of Plaintiffs' time and business records of  Plaintiff Kenneth  and  others  who had worked  on the  mold remediation.  Some of these  documents were  again sent in counsel's March, 16, 2022 letter to Ms. Potts.

23.   Ms. Potts' May 11, 2022 letter in response to counsel's earlier March 16, letter sent to her, for the first time disclosed Defendant's real reason for delaying  the 2019 reconstruction payments,  i.e., a "timely" notice of Plaintiffs' election to rebuild the residence was not made to the insurer.  Again, this alleged failure of Plaintiffs to comply with the policy's notice requirements was first made known to these Plaintiffs *circa* May 11, 2022 in written form.   These receipts of not just Plaintiff Kenneth's material procurement and reconstruction work, but the many other numerous receipts and statements for reconstruction services that were performed in the Summer and Fall 2019, copies of which documents were given to Defendant's agents on multiple times, s*ee,*  Doc. # 17-1, ¶¶, 17, 18, 19, 20  21, are actual notice of a reconstruction election. Many of these documents bore dates before Timberlake's Ju;y 22, 2019 letter, that Plaintiffs had elected to reconstruct and notified Defendant of that fact *before* its' self proclaimed "settlement period" had ended.   In summary, Plaintiffs had given Defendant through its' agents Watts and Timberlake actual notice of their intent to reconstruct by various means and at various times before, during and after reconstruction of their "election" *not* to follow the demolition "plan", which plan if it existed did so only in the minds of agent Watts, et al, because Plaintiffs never agreed to such a plan.  Their "election" to reconstruct was in fact made known by a series of events, which are not disputed by Defendant: (1) advising Defendant of their retention of both a structural engineer in and a mold remediation expert in March -May, 2019 to  determine if reconstruction was possible; (2) furnishing both these expert's findings to

Defendant in late June, 2019 that reconstruction could be accomplished, but only if complete mold remediation occurred; (3) at the same time by in addition furnishing a copy of a building permit  secured from  the Oklahoma City Development Services -- this packet of documents giving actual notice of Plaintiffs' election to reconstruct was sent to Watts' by regular mail, but also, by his earlier direction that any such communication should  be  made  to  Sara  Timberlake  by  hand  delivery  to  her  at Travelers'  Oklahoma  City  Headquarters;  (4)  by  actually  commencing  such reconstruction of the residence on June 24, 2019 with notice to Watts via both text and telephone contact  and finally (5) by sending photographs of construction progress through July-August, 2019. *See,* Exhibits 1 and 3 attached hereto.  Also hand delivered during this time were numerous statements for  reconstruction work and material.

## VI.  CAUSES OF ACTION AND CLAIM FOR RELIEF

A. Causes of Action for improper settlement practices:  There are two causes of action  for  improper  settlement  that  both  arise  from  the  above  referenced  facts underlying this claim.  Both apply to the acts of Defendant's agents,  attributed to it by the proper scope of review as is stated in paragraph 10.  These common acts violate the  statutory  Oklahoma  law  governing  insurance  settlement  practices  36  O.S.  §§ 1250.1, et. Seq., the Oklahoma Unfair Claims Settlement Practices Act , "UCSPA" due to violations of its provisions as to what constitutes unfair settlement conduct in the industry  and  which can, also, establish  contract breach.  It has been  held  that  an insurer's  violation  of the Act's standards  does not  establish a private cause of action,

19

but it has also been held that a trier of Law may use its provisions to determine if an insurer's acts were or were not reasonable.  Importantly, if they were found not to be reasonable in the premises, they would be against the public policy enunciated in the Act and in that event be in violation of  15 O.S. §211, which provides that contracts are unlawful which are "contrary to an express *provision* of law" or "contrary to the *policy* of express law though not expressly   prohibited".   (Emphasis added). Plaintiffs do contend that a violation of a law whose clear purpose is to ensure fair and reasonable treatment of the insured by regulating an insurer's settlement practices in the process of claim settlement  is just such a contract violation/breach. . *See,* 36 O.S. § 1250.3(A):

> The *provisions* of the Unfair Claims Settlement Practices Act *shall apply to all claims arising under an insurance policy* or insurance contract issued by any insurer.  (Emphasis added).

Any statutory interpretation "is governed by legislative intent, and legislative intent is ascertained from a statute's plain language." *Brisco v. State ex rel. Bd. of Regents of Agric. & Mech. Colleges,* 2017 OK 35, ¶ 10.  If a statute is plain and unambiguous, it will not be subjected to judicial construction, but will receive the effect its language dictates. *Id.*  The statutory wording provisions "*shall* apply to all claims arising under" a policy seems very plain and unambiguous.  And since "shall" has long been held to be a statutory word of command, what Defendant has sought in dismissal would be to have the Court ignore that emphasized language and hold it does not apply to this policy, thereby making that language to be a vain legislative act, mere surplusage.

20

B.  Cause of action for  failing  to afford resonable modification of process:

  The unexplained conduct by Defendant not to give Plaintiff  Tyrene Turoczi the reasonable process modification of receiving and/or transmitting communication about her claim by using text messaging rather than by e-mail, because of her need to receive such communication in a manner that would accommodate her severe vision loss, but also, because she could not even receive communication sent to the e-mail address Defendant insisted on using:  "punkphillyokc@gmail.com", constitutes violation of the 1990 Americans with Disabilities Act, Title III ("ADA") and in particular of 42 U.S.C. § 12182(a) & (b)(1)(D):  Administrative Services.  Refusal to extend such requests for process modification or to even respond to many other requests, also, renders each such refusal to be an unfair settlement practice in that Defendant did not reasonably communicate with her as required by 36 O.S. § 1250.4 (C).

C.  Claims for Relief:    Plaintiff's claim for relief of contract insurance payment rights owed under the base policy and the several additional coverages and endorsements thereon and not paid is the amount of $413,498.00 or an amount which may more fully and accurately be proved, plus any interest,  for the costs of litigation and punitive damages arising from its intentional and oppressive conduct in the claim's settlement.

  Plaintiffs further request declaratory relief under 42 U.S. Code § 12188 that Defendant's acts in refusing to make reasonable modification of its settlement practices for Tyrene, given her disability and need to communicate via a workable electronic program, constitute violation of the ADA and that she be afforded any remedy it offers.

All of which is respectfully submitted.

Jury trial demanded.

> _/s/ Gary W. Gardenhire____
> Gary W.Gardenhire,  OB#3235
> 1005 Fountain Gate Cir.
> Norman, OK 73072
>
> Tel.:     405-701-3398
> E-mail:  ggardenhire7@gmail.com
>
> Attorney for Plaintiffs

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 24rh day of April, 2023, a true and correct copy of the foregoing document was served upon the following counsel via the Court's electronic mail system  and/or U.S. Mail, postage prepaid thereon to:

Sara E. Potts
Doerner, Saunders, Daniel, _et al_
210 Park Avenue, Suite 1200
Oklahoma City, OK73102

-and-

Michael S. Linscott
Alexandra J. Gage
Williams Center Tower II
2West Second Street, Suite 700
Tulsa, OK 73403-3177

Exhibits Nos. 1-4; earlier attachment as explained, infra.


 _/s/ Gary W. Gardenhire_____



EXHIBIT

1

page 1



**EXHIBIT**

1

Page 2


**TRAVELERS** ⛱

**Asah Watts**
*General Adjuster*
Personal Insurance
Property Major Case Unit
P.O. Box 430
Buffalo, NY 14202
405.431.7482 TEL
866.381.6247 FAX

February 8, 2019

Kenneth and Tyrene Turoczi
11701 Silvermoon Dr.
Oklahoma City, OK 73162-2224

and

Kenneth and Tyrene Turoczi
Southwest Cathedral
3440 S.W. 25th Street
Oklahoma City, OK 73108-5025

Dear Mr. and Mrs. Turoczi:

Travelers is continuing to work as quickly as possible to resolve your remaining claims as a result of the fire. However, attempts to communicate with you by text, phone and in person have not been as productive as they could be. Further, your preferred communication (text messaging) has not been helpful in continuing to move this claim forward.

You have mentioned on several occasions that you have retained legal counsel and we have asked on several occasions for the name of your counsel so we could correspond with that person. As I advised you by phone today and given the issues we are having between one another with respect to your personal property claims, we have retained Sarah Timberlake with Doerner, Saunders, Daniel & Anderson, L.L.P. to represent Travelers going forward on this claim. We believe it will be in the best interest of all to schedule a date and time for you and your counsel to meet with a representative of Travelers and Ms. Timberlake at your attorney's office or her office. During this meeting, we can address the current status of your claim including payments issued to date and hopefully reach an agreement on how to resolve the remaining claims under your policy. We would request that both you and your husband be present at this meeting and will certainly work with you and your attorney to arrange a mutually convenient time. Please have your attorney contact Ms. Timberlake at 405-898-8651.

You indicated in recent messages that you requested a copy of the certified policy but had not received one. My records show that I contacted you on or about January 8, 2019 advising a copy of the policy could be hand delivered to you at whatever location you wish. The policy was mailed to your home address on January 9, 2019 and I also delivered a copy to the church at the same place a $10,000 advance had been delivered. We subsequently learned Mr. Turoczi had

possession of the policy on or about January 9, 2019. We previously sent you a Proof of Loss and inventory sheets.

For your convenience, I am again sending a certified copy of the policy. I am also enclosing the most recent estimate of your loss which reflects any adjustments per the HO-420 Endorsement.

Sincerely,

Asah Watts
TRAVELERS COMMERCIAL INSURANCE COMPANY

4919564.1

EXHIBIT

2

Page 2



EXHIBIT

TT'S 3
Amended comp.
6 numbered doc.

tabbies®

EXHIBIT

3   No 1

tabbies®



EXHIBIT

3 No.2

tabbies



**EXHIBIT**
3 No. 3



EXHIBIT

3 No. 4

tabbies



**EXHIBIT**

tabbies®

3 No. 5



EXHIBIT

tabbies®

3 No.6

This text document is messages between Plaintiff Tyrene ("Sent") and Mr. Watts ("Received") from June 24 through July 9, 2019 regarding a copy of the claims file and the manner of transporting it (by mail to the Church) rather than e-mail. Dates at the bottom are the older and going upward traces the later text exchanges between them.

| | | |
|---|---|---|
| Sent | Jul 9, 2019 9:24:09 AM | I need you to mail my complete file to the church I have sent in notarized request from my family and content sheets and nothing has been done I have sent in mold report and reciept for code upgrades nothing has been done I have requested the moneh for deri removal still nothing I guess I will take my 6 foot banner and sit outside travelers in okc until I get help |
| Received | Jun 25, 2019 11:30:19 AM | punkphillyokc@gmail.com |
| Received | Jun 25, 2019 11:28:18 AM | Hello Mrs. Turoczi, I apologize I have been out of the office. Do you want me to email your requested information to the email address we have listed for you? |
| Sent | Jun 25, 2019 11:00:36 AM | Why wont anyone help me with this lousy company? |
| Sent | Jun 25, 2019 10:53:59 AM | I need your lawyers number |
| Sent | Jun 25, 2019 10:53:46 AM | I have ask for months for my family to be paid and my deri to be paid . |
| Sent | Jun 25, 2019 10:53:02 AM | I need a copy of my complete file |
| Sent | Jun 24, 2019 11:23:26 AM | Please text me back |
| Sent | Jun 24, 2019 | Will you please text me back . |

EXHIBIT
4